[No. B191683. Second Dist., Div. Eight. Apr. 1, 2008.]

THE PEOPLE, Plaintiff and Respondent, v.
HENRY SZADZIEWICZ, Defendant and Appellant.

826

## COUNSEL

Seymour I. Amster for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Lance E. Winters and Taylor Nguyen, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

## EGERTON, J.*—

### INTRODUCTION

A jury convicted appellant Henry Szadziewicz of attempted murder, aggravated mayhem, and first degree burglary. He raises a number of issues on

---

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

appeal. First, he contends there was insufficient evidence of specific intent to support his aggravated mayhem conviction. Second, he argues the court had a duty to instruct sua sponte on unreasonable self-defense. That instruction would have amounted to instructions on attempted voluntary manslaughter, assault, and battery as lesser included offenses. Third, he claims his trial attorney was ineffective because he (1) did not ask for instructions on these lesser offenses; (2) referred to Szadziewicz in his closing argument as "strange" and "paranoid"; and (3) did not call his daughter Fay as a trial witness. Fourth, Szadziewicz contends the prosecutor committed misconduct by arguing matters outside the record. Fifth, he claims the trial court violated his confrontation rights by limiting cross-examination about a witness's prior conviction. Sixth and finally, he asserts that his sentence is unconstitutionally disproportional.

We conclude, first, the victim's testimony that Szadziewicz repeatedly slashed his face while holding him down provided substantial evidence supporting the aggravated mayhem conviction. Second, the trial court had no duty to instruct on unreasonable self-defense. Szadziewicz burglarized the victim's hotel room while the victim was asleep, so he created the circumstances that justified the victim's lawful physical resistance. Moreover, the unreasonable self-defense theory does not apply to aggravated mayhem.

Third, for the same reasons, defense counsel's failure to request instruction on unreasonable self-defense (that is, attempted voluntary manslaughter, assault, and battery) did not constitute ineffective assistance. Read in context, defense counsel's references to Szadziewicz as strange and paranoid were reasonable attempts to counter the prosecutor's arguments and to help jurors accept Szadziewicz's testimony as credible. Defense counsel therefore did not provide ineffective assistance by using these words. The record establishes neither why defense counsel did not produce Fay Szadziewicz to testify nor what her testimony would have been. It thus is insufficient to establish either deficient performance by counsel or resulting prejudice.

Fourth, the prosecutor did not argue matters outside the record by referring to Szadziewicz's "strange world" and "strange life." Her argument compared Szadziewicz's behavior and his own proffered defense with the way most people behave. Fifth, the trial court did not violate the confrontation clause by preventing inquiry into the circumstances surrounding a witness's prior conviction. Sixth and finally, Szadziewicz's concurrent life sentences are not unconstitutionally disproportionate to his very serious offenses of aggravated mayhem and willful, deliberate, and premeditated attempted murder.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

On January 12, 2005, Mark Rossmeisl was asleep in his room on the eighth floor of the Frontier Hotel in downtown Los Angeles. The lock on his door was broken; he had put a gallon of water against the door to keep it closed. Sometime between 8:00 and 8:30 a.m., Rossmeisl woke up to see appellant Henry Szadziewicz crouching and approaching his bed. Rossmeisl did not know who Szadziewicz was. The next moment, Rossmeisl found a knife in his face. Szadziewicz put one hand on Rossmeisl's chest. With the other hand, he began to slice Rossmeisl's face with the knife. Szadziewicz slashed Rossmeisl twice while he was lying on his back on the bed with Szadziewicz right on top of him. He sliced Rossmeisl's face from the temple toward the nose, then back toward the ear. Next, Szadziewicz sliced from above Rossmeisl's eyebrow down through his nostril, splitting his nose wide open.

Rossmeisl struggled with Szadziewicz and tried to push him off, but Szadziewicz overpowered him.[1] Szadziewicz was strong and seemed focused. Szadziewicz cut each side of Rossmeisl's neck. At one point, Szadziewicz held Rossmeisl facedown on the bed. Rossmeisl was bleeding profusely. He began to lose consciousness.

Rossmeisl gathered his strength and managed to get out from under Szadziewicz. He stood up and the two men faced each other. Szadziewicz stabbed Rossmeisl on the hand. Rossmeisl tried to get out of the room, but Szadziewicz held the door closed with his foot. Rossmeisl was yelling for his life. The two men struggled throughout the room and into the bathroom. Szadziewicz slashed at Rossmeisl and cut his left hip. Rossmeisl bit Szadziewicz. Rossmeisl—who was barefoot—stomped on Szadziewicz's foot. Rossmeisl finally managed to get out the door. He ran down the hall in his underwear and took the elevator to the lobby to get help.

Clifford Davis lived in the room next to Rossmeisl. He did not know Rossmeisl. Davis heard moaning, then scuffling and banging sounds. Then he heard a man yell, "Help! He's killing me!" and "Help! I'm being killed!" more than 12 times. Davis called 911. He saw the door to Rossmeisl's room open, then slam shut. Soon after, Davis saw a man come out of the room; his entire face and head were covered in blood. The man, yelling, ran toward the elevators.

A security guard downstairs saw Rossmeisl come out of the elevator drenched in blood with lacerations all over his face. Rossmeisl's face was

---

[1] Szadziewicz was 51 at the time of the attack and Rossmeisl was 46.

unrecognizable; he was slit everywhere; he was mumbling. Rossmeisl collapsed in the lobby. When police arrived, Rossmeisl was sitting in a chair, paramedics were attending to him. Blood had formed a pool about a foot in diameter below his chair.

The mattress in Rossmeisl's room was soaked with blood. There was blood all over the walls. A bloody trail led from the room to the elevator. The elevator also was covered with blood.

About three minutes after Rossmeisl fled from his room to the elevator, Davis saw Szadziewicz come out of Rossmeisl's room and walk calmly down the hall to the stairwell. Szadziewicz appeared not to have any cuts. Davis gave the security guard a description of Szadziewicz. When Szadziewicz emerged from the stairwell downstairs, the security guard stopped him. Szadziewicz had a black plastic garbage bag with him. In the bag were latex gloves drenched in blood, a bloody jacket, lighter fluid, matches, a screwdriver, a rag, and a box cutter or knife with human flesh still on it. The guard also found a small knife in Szadziewicz's pocket.

Rossmeisl sustained many cuts on his face and neck. He had cuts of three to four centimeters each on his left cheek, on his left jaw, behind one ear, on his nose, and from his eyebrow down toward his nose. A flap of his nose was coming off. Two six-centimeter cuts from his temple toward his nose and from his nose toward his ear intersected, forming a flap of skin on his cheek. An officer who arrived at the scene could see exposed muscle on Rossmeisl's face. Rossmeisl also had six-centimeter cuts on the left and right side of his neck, near the carotid artery and jugular vein. In addition, Rossmeisl had a two-inch cut on his left hip, cuts on both sides of his chest, and a one-inch-deep stab wound to his right hand. Emergency room personnel rushed Rossmeisl to surgery. He received 110 to 120 stitches. He was in the hospital for four days before he left, against medical advice. Because of damage to a cranial nerve, Rossmeisl suffered some paralysis to the left side of his face. At the time of trial, more than seven months later, Rossmeisl still had numbness in his neck.

Rossmeisl had been dating Szadziewicz's 24-year-old daughter Fay. Rossmeisl was 22 years older than Fay. He was an unemployed actor who occasionally was homeless. Fay had told her father that Rossmeisl had told her he was "into some light street drugs." Szadziewicz claimed that he went to Rossmeisl's room hoping to find drugs that he could show to his daughter to prove that Rossmeisl used drugs. Szadziewicz testified that Fay said she would break up with Rossmeisl if she had proof he used drugs. Szadziewicz did not explain why Fay needed "proof" given that Rossmeisl had admitted his

drug use to her. After Rossmeisl fled from the room, Szadziewicz did not look for or recover any drugs. Instead, he "aborted his mission" because of "the altercation."

The jury convicted Szadziewicz of attempted murder, aggravated mayhem, and first degree burglary. It found that the attempted murder was willful, deliberate, and premeditated. The jury also found that Szadziewicz personally used a deadly weapon and inflicted great bodily injury.

Szadziewicz moved for a new trial and to reduce his sentence, arguing that life imprisonment would be constitutionally disproportionate. The trial court denied both motions. It sentenced Szadziewicz to two concurrent terms of life in prison, plus four years.

## DISCUSSION

1. *Substantial evidence supports the aggravated mayhem conviction.*

Szadziewicz argues the evidence did not show that he had the specific intent required for aggravated mayhem. We review the whole record in the light most favorable to the judgment to decide whether substantial evidence supports the conviction, so that a reasonable jury could find guilt beyond a reasonable doubt. (*People v. Ceja* (1993) 4 Cal.4th 1134, 1138 [17 Cal.Rptr.2d 375, 847 P.2d 55].)

Aggravated mayhem requires proof the defendant specifically intended to maim—to cause a permanent disability or disfigurement. (*People v. Quintero* (2006) 135 Cal.App.4th 1152, 1162 [37 Cal.Rptr.3d 884] (*Quintero*).) A jury may not find specific intent "solely from evidence that the injury inflicted actually constitutes mayhem; instead, there must be other facts and circumstances which support an inference of intent to maim rather than to attack indiscriminately." (*People v. Ferrell* (1990) 218 Cal.App.3d 828, 835 [267 Cal.Rptr. 283].) "A jury may infer a defendant's specific intent from the circumstances attending the act, the manner in which it is done, and the means used, among other factors." (*Id.* at p. 834.) "[E]vidence of a 'controlled and directed' attack or an attack of 'focused or limited scope' may provide substantial evidence of" a specific intent to maim. (*Quintero, supra,* 135 Cal.App.4th at p. 1162, quoting *People v. Lee* (1990) 220 Cal.App.3d 320, 326 [269 Cal.Rptr. 434].)

Rossmeisl's testimony shows a controlled and directed attack focused on his face and neck. Szadziewicz inflicted all of the cuts to Rossmeisl's face while Rossmeisl was still on the bed, leaving the mattress soaked with blood. These facial cuts were numerous and severe. The overlapping cuts from the

temple to nose and back toward the ear were especially nasty. They covered prominent and very visible parts of the face and were deep enough to damage the nerves and cause paralysis. The placement and nature of these and the other facial lacerations amply supported a reasonable inference that Szadziewicz meant to disfigure Rossmeisl's face. The jury looked at photographs of Rossmeisl's wounds, taken at the hospital after surgery. Repeatedly cutting a person's face constitutes sufficient evidence of a specific intent to maim. (*Quintero, supra*, 135 Cal.App.4th at p. 1163.)

That Szadziewicz also cut Rossmeisl on his hand, hip, and chest does not diminish the strong inference that he intended to maim his victim. Szadziewicz inflicted these wounds after Rossmeisl managed to get out from under him and stand up from the bed. Before Rossmeisl mounted any effective resistance, Szadziewicz limited his attack to slicing Rossmeisl's face and neck. From this evidence a reasonable jury readily could infer that Szadziewicz acted with the intent to disfigure Rossmeisl permanently.

Szadziewicz argues that "[t]he focus of the attack was dictated by . . . poor lighting [in the room] and [the] close proximity of the altercation." Szadziewicz bases his argument on his own version of what happened that morning. Szadziewicz testified at trial that Rossmeisl's room was "kind of dark" because there was a blanket over the window. He walked over to the figure in the bed to see if he was in "the right room." Rossmeisl suddenly "jackknifed" out of bed and pushed Szadziewicz against the wall. Szadziewicz knew Rossmeisl had martial arts training. Szadziewicz pulled out a box cutter he carried for work and waved it at Rossmeisl. Rossmeisl grabbed Szadziewicz's wrist and tried to get the box cutter. Rossmeisl cut his own face, neck, and hand in the struggle for the box cutter. Szadziewicz did not sustain any cuts in the altercation. Szadziewicz denied any intent to disfigure or kill Rossmeisl.

Szadziewicz errs in viewing the evidence in the light most favorable to him rather than to the verdict. Under the proper standard of review, we must accept Rossmeisl's version of events. Szadziewicz put his hand on Rossmeisl's chest and repeatedly slashed his face and neck as he lay in bed; poor lighting and close quarters did not contribute to this conduct. The later struggle throughout the room as Rossmeisl tried to escape did not negate or diminish the strong inference of specific intent from Szadziewicz's initial attack.

Szadziewicz also argues that the fact he carried lighter fluid and matches "negates the implication that [he] intended to carve the victim's face." (Szadziewicz testified that he planned to burn the drugs with the lighter fluid if the police stopped him.) Because Szadziewicz did not use the lighter fluid

and matches, we cannot know what he planned to do with them. But an intent to burn Rossmeisl or even to kill him is not inherently incompatible with an intent to maim. Burning can cause permanent disfigurement. "[A] defendant may intend both to kill his or her victim and to disable or disfigure that individual if the attempt to kill is unsuccessful." (*People v. Ferrell, supra*, 218 Cal.App.3d at pp. 833–834.) Uncertainty about why Szadziewicz was carrying lighter fluid and matches does not negate or weaken the strong inference of an intent to maim created by Szadziewicz's actual conduct in repeatedly slashing at Rossmeisl's face while holding him down on his bed. Substantial evidence supports the verdict.

### 2. *The trial court had no duty to instruct on unreasonable self-defense.*

The trial court instructed the jury on self-defense. Szadziewicz argues, however, that the theory of unreasonable self-defense (also known as imperfect self-defense) applied to his case. He therefore contends that the trial court erred by failing to instruct sua sponte on unreasonable self-defense (that is, attempted voluntary manslaughter as a lesser included offense of attempted murder). He further argues that unreasonable self-defense applies to aggravated mayhem, and that the court therefore should have instructed the jury on assault and battery as lesser included offenses of aggravated mayhem.[2]

#### a. *The duty to instruct sua sponte*

■ Even without a request, a trial court must instruct on general principles of law that are closely connected to the facts before the court and that are necessary for the jury's understanding of the case. (*People v. Montoya* (1994) 7 Cal.4th 1027, 1047 [31 Cal.Rptr.2d 128, 874 P.2d 903].) It must instruct sua sponte on a lesser included offense where there is evidence that, if believed by the trier of fact, would absolve the defendant of the greater offense, but not of the lesser. (*People v. Memro* (1995) 11 Cal.4th 786, 871 [47 Cal.Rptr.2d 219, 905 P.2d 1305].) This obligation extends to all theories of a lesser included offense that find substantial support in the evidence. (*People v. Breverman* (1998) 19 Cal.4th 142, 162 [77 Cal.Rptr.2d 870, 960 P.2d 1094].) However, the court need not instruct on a lesser offense when there is no evidence the offense was less than that charged. (*People v. Barton* (1995) 12 Cal.4th 186, 194–195 [47 Cal.Rptr.2d 569, 906 P.2d 531].)

#### b. *Unreasonable self-defense*

■ A person who kills or tries to kill someone because he actually, but unreasonably, believes he needs to defend himself from imminent death or

---

[2] The court instructed on simple mayhem as a lesser included offense.

great bodily injury is deemed to have acted without malice. (*People v. McCoy* (2001) 25 Cal.4th 1111, 1116 [108 Cal.Rptr.2d 188, 24 P.3d 1210]; *In re Christian S.* (1994) 7 Cal.4th 768, 783 [30 Cal.Rptr.2d 33, 872 P.2d 574].) Under this unreasonable self-defense theory, the crime committed is manslaughter or attempted manslaughter, not murder or attempted murder. (*People v. McCoy, supra,* 25 Cal.4th at p. 1116.) However, a defendant who—through his own wrongful conduct, such as initiating a physical assault or committing a felony—has created circumstances under which his adversary's attack or pursuit is legally justified may not invoke unreasonable self-defense. (*People v. Seaton* (2001) 26 Cal.4th 598, 664, 110 Cal.Rptr.2d 441 [28 P.3d 175]; *In re Christian S., supra,* 7 Cal.4th at p. 773, fn. 1.)

### c. *The attempted murder charge*

Szadziewicz's unreasonable self-defense theory rests on his own version of the events in Rossmeisl's hotel room. However, even if Szadziewicz's testimony constituted reasonable, credible evidence of solid value (*Quintero, supra,* 135 Cal.App.4th at p. 1165), he was not entitled to an instruction on unreasonable self-defense. Szadziewicz admits he committed a burglary by entering Rossmeisl's hotel room without his consent and with the intent to steal any drugs he found. Szadziewicz admits he still was in Rossmeisl's room when Rossmeisl responded to the unlawful invasion by leaping from his bed and pushing Szadziewicz against the wall. So even under Szadziewicz's version of what happened, he created the circumstances under which Rossmeisl's "attack" was justified. Szadziewicz therefore was not entitled to rely on the theory of unreasonable self-defense. (*People v. Hardin* (2000) 85 Cal.App.4th 625, 634 [102 Cal.Rptr.2d 262]; cf. *People v. Vasquez* (2006) 136 Cal.App.4th 1176, 1179–1180 [39 Cal.Rptr.3d 433] [defendant entitled to unreasonable self-defense instruction where victim's use of force was unlawful].)

Moreover, Szadziewicz testified that Rossmeisl cut his own face and neck in the struggle for the box cutter. Under this victim-inflicted-his-own-injuries theory, Szadziewicz arguably was not entitled even to the actual self-defense instruction that the court gave. That windfall did not entitle him to an additional instruction on imperfect self-defense. In addition, even if Szadziewicz's testimony could be construed as an admission that *he* cut Rossmeisl during the struggle, an imperfect self-defense instruction is not required just because the court is instructing on actual self-defense. Where, as here, the defendant's version of events, if believed, establish actual self-defense, while the prosecution's version, if believed, negates both actual and imperfect self-defense, the court is not required to give the instruction. (*People v. Rodriguez* (1997) 53 Cal.App.4th 1250, 1269, 1275–1276 [62 Cal.Rptr.2d 345].)

d. *The aggravated mayhem charge*

Citing *People v. McKelvy* (1987) 194 Cal.App.3d 694 [239 Cal.Rptr. 782] (*McKelvy*), Szadziewicz argues that unreasonable self-defense also applies to aggravated mayhem. He contends that, under that theory, a properly instructed jury could have convicted him of assault or battery as a lesser included offense.

In *McKelvy*, a single justice concluded that unreasonable self-defense applies to mayhem: "One who truly believes there is a need for self defense cannot be said to act with intent to 'vex, injury or annoy' and may be found guilty of no more than an assault or battery." (*McKelvy, supra*, 194 Cal.App.3d at p. 702, fn. omitted.) However, the two concurring justices joined in the result only. (*Id.* at pp. 707–708 (conc. opn. of Smith, J.).) No other reported decision has followed *McKelvy*, and several have expressly rejected it. For example, in *People v. Sekona* (1994) 27 Cal.App.4th 443 [32 Cal.Rptr.2d 606] (*Sekona*),[3] and *People v. Hayes* (2004) 120 Cal.App.4th 796 [15 Cal.Rptr.3d 884] (*Hayes*), courts held that unreasonable self-defense does not apply to mayhem. The *Hayes* court explained that *People v. Flannel* (1979) 25 Cal.3d 668 [160 Cal.Rptr. 84, 603 P.2d 1] (*Flannel*) predicated its adoption of the unreasonable self-defense theory on the principle that a person who believes in the need to defend himself "lacks the crucial characteristic of 'malice aforethought' said in *Flannel* to justify the defense, i.e., awareness that one's conduct does not conform to the expectations of society." (*Hayes, supra*, 120 Cal.App.4th at p. 802.) In contrast, the malice required for the commission of mayhem is only an " 'intent to vex, injure or annoy,' " which "connotes no element of knowing violation of social norms. . . . A belief that one is acting in self-defense, whether reasonable or unreasonable, has no tendency to negate the element of malice. Indeed the intent to vex, injure, or annoy may be present when one acts in *reasonable* self-defense. Such a circumstance affords a defense not because it negates the element of malice but because it *excuses or justifies* the conduct in question despite the intent to injure." (*Id.* at p. 803.)

*Quintero* also rejected *McKelvy* and extended the rationale of *Hayes* and *Sekona* to aggravated mayhem. The court in *Quintero* explained, "Even though aggravated mayhem requires proof of a specific intent to maim the victim, it still requires proof that the person who had such specific intent to inflict the maiming injury did so 'maliciously, that is, with an unlawful intent to vex, annoy, or injure another person.' . . . In other words, the same malice

---

[3] In *People v. Michaels* (2002) 28 Cal.4th 486 [122 Cal.Rptr.2d 285, 49 P.3d 1032], the California Supreme Court cited *Sekona* in support of its holding that trial courts have no sua sponte duty to instruct on unreasonable defense of others as a defense to murder. (*Id.* at p. 530.)

element is required for both the lesser offense of mayhem and the greater offense of aggravated mayhem and is still different from the malice aforethought required for murder." (*Quintero, supra,* 135 Cal.App.4th at p. 1167, citations omitted.) The court further noted, " '[I]mperfect self-defense is not an affirmative defense, but a description of one type of voluntary manslaughter.' " (*Id.* at p. 1166.)

■ Because the theory of unreasonable self-defense does not apply to a charge of aggravated mayhem, the trial court had no duty to instruct on that theory or assault or battery as lesser included offenses, either sua sponte or on request. (In any event, even if unreasonable self-defense applied to aggravated mayhem, Szadziewicz would be precluded from invoking it because he created the circumstances justifying Rossmeisl's "attack," as discussed above.)

3. *Defense counsel's failure to request instructions on unreasonable self-defense and lesser included offenses based on that theory did not constitute ineffective assistance of counsel.*

■ Szadziewicz contends his trial attorney was ineffective because he did not ask the trial court to instruct the jury on unreasonable self-defense. As discussed above, the evidence did not support application of unreasonable self-defense because even the evidence most favorable to Szadziewicz established that he created the circumstances justifying Rossmeisl's resistance. Also, the unreasonable self-defense theory does not apply to aggravated mayhem. The instructions that Szadziewicz now says he wanted therefore were factually and legally unsupported. Counsel's failure to make a futile or unmeritorious motion or request is not ineffective assistance. (*People v. Price* (1991) 1 Cal.4th 324, 387 [3 Cal.Rptr.2d 106, 821 P.2d 610].)

4. *Defense counsel's reference to Szadziewicz as strange and paranoid did not constitute ineffective assistance.*

Szadziewicz also argues that his trial attorney was ineffective because he said in closing argument that Szadziewicz was "strange" and "paranoid." He asserts that the use of these words undermined his self-defense theory and implied that he was guilty.

■ An appellant who claims that counsel was ineffective must show, by a preponderance of the evidence, objectively unreasonable performance by counsel as well as a reasonable probability that, but for counsel's errors, appellant would have obtained a more favorable result. (*People v. Ledesma* (1987) 43 Cal.3d 171, 216–218 [233 Cal.Rptr. 404, 729 P.2d 839].)

The principal thrust of defense counsel's closing was that the prosecution had not met its burden of proof, and that Szadziewicz's testimony

was credible and accurately described what happened in Rossmeisl's hotel room. Among other matters, counsel argued the evidence did not show that Szadziewicz had the intent to kill or to maim: "Mr. Szadziewicz thought he was getting attacked. The other person thought he was getting attacked. It's a series of unfortunate events. But the most important part is there was no intent. There was only one intent in this case, that he wanted to take the drugs to show Fay. [¶] It doesn't have to make sense to you but it makes sense to Mr. Szadziewicz. And think about that [through] Mr. Szadziewicz'[s] mind and you will have to come back not guilty on all counts."

In an apparent effort to help the jurors relate to Szadziewicz and to counter the prosecutor's argument that Szadziewicz was "a control freak," defense counsel argued, "Mr. Szadziewicz is strange. I'm sure you all realize that [his] is not the typical Los Angeles family. He mentioned that his daughter was . . . home-schooled, was raised in a certain discipline that most of us probably don't know unless we're of some sort of ethnic background or from a certain country where we bring those morals here. [¶] Most of us . . . aren't raised in a tight knit family where our parents know where we are even when we're twenty-four years old. [¶] But this is a devout Christian type of family that Mr. Szadziewicz was raising. His morals are not on trial. His actions are and his intent is. And to understand that none of these charges are substantiated or not proven for that matter is to understand who Mr. Szadziewicz is."

Counsel later continued the same theme: "The question [here] is were there any laws broken and what was the intent of Mr. Szadziewicz. [¶] If you believe that's what he wanted to do [show Fay that Rossmeisl was using drugs], if you understand who he is and where he comes from, then you'll say, you know what, yeah, I think the guy is a little strange but could I see him doing that? [¶] And that's okay. [¶] It's okay to be strange. There is no law against being strange. There is no law against doing what you think is necessary to protect your daughter so long as it's within the bounds of the law."

Later, counsel discussed the gloves Szadziewicz carried with him: "It was a latex pair of gloves. He's a biohazard—he treats waste. He . . . does waste and water treatment and he does other sorts of things during his job which require him to wear gloves. [¶] He also told you that he didn't want to go down to a seedy neighborhood and touch anything. [¶] He is a little paranoid, yeah, but he's going into a shady area. He didn't want to touch anything. That's what he said. [¶] Remember, being strange doesn't make it against the law."

Considered in context, defense counsel's argument neither undermined any defense nor implied that Szadziewicz was guilty. The arguments were a

reasonable attempt to bolster the credibility of Szadziewicz's testimony by helping jurors to understand and relate to Szadziewicz's unusual mindset. The arguments also were an effort to defuse or rebut the prosecutor's arguments. The prosecutor had argued that Szadziewicz was "a control freak of unreasonable proportions" who was "on a mission to get rid of the one person who took the control away from him." She later elaborated, "He gave you the motive which is that he is a control freak. He has absolute control over his family. His pride and joy is his daughter. His wife doesn't work. He has home schooled his child. He admitted to you that there was nothing she does that he doesn't know about. [¶] . . . [¶] His daughter has never, ever in her life spent a night away from him. [¶] Not ever. [¶] Before Mr. Rossmeisl she has never, ever dated anybody. [¶] . . . [¶] A 24-year-old woman. [¶] Is that realistic? [¶] No. [¶] It's strange. [¶] It's strange." The prosecutor continued this theme by arguing that the relationship between Rossmeisl and Fay represented a loss of control for Szadziewicz, "made him insane," and caused him to go "on a mission that day to get rid of this guy one way or the other. He's just conveniently telling you now that it was for some nonsensical, illogical, inconsistent reason because there is nothing else . . . he can say." She also characterized Szadziewicz's version of the events as "absurd, deranged," "unreasonable," and "unbelievable."

In light of the prosecutor's arguments, the implausible nature of Szadziewicz'stestimony, and the relatively uncommon circumstances of the Szadziewicz family's lifestyle, defense counsel's characterizations of Szadziewicz as strange and paranoid were reasonable, mild, and inoffensive. The use of these terms did not contradict or undermine any defense theory, but instead supported Szadziewicz's testimony and tried to deflect the prosecutor's arguments about motive and the implausibility of Szadziewicz's testimony. None of counsel's "strange" or "paranoid" references in any way suggested Szadziewicz was guilty. Accordingly, Szadziewicz has not overcome the presumption that counsel was effective and that the challenged arguments constituted sound trial strategy. (*In re Jones* (1996) 13 Cal.4th 552, 561 [54 Cal.Rptr.2d 52, 917 P.2d 1175].)

5. *The record does not support Szadziewicz's contention that his attorney's failure to produce Fay at trial constituted ineffective assistance of counsel.*

Defense counsel apparently had listed Fay Szadziewicz as a witness, but was "unable to produce her." Counsel told the court that Fay "was just going to corroborate the fact that the drugs—seeing the drugs." Appellant contends his attorney was ineffective by failing to subpoena Fay. He argues Fay's testimony would have "added credibility to appellant's concern and would have supported the defense of imperfect self-defense." He also argues that

Fay could have "countered the testimony that appellant was a 'control freak' who wanted to shield his daughter from dating. . . . Fay would have testified that appellant tried to fix her up with a 'real date' around holiday time."

The record does not reveal why counsel did not subpoena Fay. Fay may have told counsel that she would testify—leading him to believe no subpoena was necessary—then changed her mind at the last minute. Or counsel may have interviewed Fay and discovered that her testimony would not have supported her father's defense. The record is simply insufficient to overcome the presumption that counsel performed effectively and that the failure to subpoena Fay was sound trial strategy. Similarly, the record provides no support for the contention about Fay's expected testimony, which goes to both the deficient performance and prejudice elements of the ineffective assistance claim. Fay did not testify at the preliminary hearing. When the record does not demonstrate the alleged error or prejudice, the proper remedy is a petition for a writ of habeas corpus. (*People v. Pope* (1979) 23 Cal.3d 412, 426 [152 Cal.Rptr. 732, 590 P.2d 859], overruled on other grounds in *People v. Berryman* (1993) 6 Cal.4th 1048, 1081, fn. 10 [25 Cal.Rptr.2d 867, 864 P.2d 40].)

In addition, Szadziewicz's argument that Fay's testimony would have countered the prosecutor's characterization of him as a "control freak"—a term not used until closing arguments—is speculative at best. The purported testimony—that Fay's father was choosing her dates for her at age 24—supports rather than rebuts the prosecutor's argument.

6. *The prosecutor did not argue matters outside of the record.*

Szadziewicz contends the prosecutor argued matters outside the record when she referred to his "strange world" and "strange life." He argues jurors might have understood this to refer to some psychological evidence that had not been presented during trial.

When an appellant bases a prosecutorial misconduct claim on the prosecutor's arguments to the jury, we consider how a reasonable juror would or could have understood the statement in the context of the entire argument. (*People v. Benson* (1990) 52 Cal.3d 754, 793 [276 Cal.Rptr. 827, 802 P.2d 330].) No misconduct exists if a juror would have taken the statement to state or imply nothing harmful. (*Ibid.*) A prosecutor may fairly comment on and argue any reasonable inferences from the evidence. (*People v. Dennis* (1998) 17 Cal.4th 468, 522 [71 Cal.Rptr.2d 680, 950 P.2d 1035].) A prosecutor may not, however, suggest the existence of facts outside the record by arguing matters not in evidence. (*People v. Benson, supra,* 52 Cal.3d at pp. 794–795.) Absent a showing that an objection or request for admonition would have

been futile or that the harm could not have been cured, an appellant may not complain of prosecutorial misconduct unless he timely objected to the alleged misconduct at trial and asked the court to admonish the jury to disregard the impropriety. (*People v. Hill* (1998) 17 Cal.4th 800, 820 [72 Cal.Rptr.2d 656, 952 P.2d 673].)

In her closing, the prosecutor addressed defense counsel's argument that Clifford Davis testified falsely: "When you listened to his testimony did he seem like he was lying? [¶] No, he didn't. He was honest. [¶] But not only that but you have to look at motive. [¶] Why would someone lie? [¶] Do we think that people just get up on the witness stand and for no reason just lie just for the sake of lying? [¶] Of course not. [¶] Maybe in the defendant's strange world and strange life as counsel has tried to tell you anybody in that strange world—maybe people would just get up on the stand and lie for no reason, but in the real world, this world, this courtroom, we know that people don't just get up here and lie unless they have a reason to lie."

The prosecutor later addressed the plausibility of Szadziewicz's explanation for carrying lighter fluid and matches: "That is crazy. [¶] He's going to bring lighter fluid and matches with him so that if the police arrest him for drugs he can get rid of the drugs. [¶] How is this logistically going to happen? The police, say, sir, you're under arrest, stop it. I see that you have drugs. [¶] I'm sorry, officer. If you could just hold on for a second. [¶] What's he going to do? [¶] Take the lighter fluid and douse the item and then say, officer, hold on, give me another minute, let me light this match and get rid of the evidence in front of you? [¶] I mean, how is this going to happen? [¶] It is outrageous. That is unreasonable. You reject it. Maybe in—he thinks that in his strange world that this could happen. [¶] This isn't his strange world. We live in the real world. And in the real world that is an outrageous story. That is an outrageous explanation. The only reasonable explanation for why you have lighter fluid and matches and a box cutter and a knife and latex gloves when you secretly walk into a hotel room of the person that you cannot stand, who is ruining in your mind your daughter's life, the only reason you bring in lighter fluid is to torch him or torch his place."

Szadziewicz did not object to the challenged statements. So he forfeited any objection to them. (*People v. Hill, supra,* 17 Cal.4th at p. 820.) However, even if he had objected, no reasonable juror would understand either of the challenged parts of the argument, in context, to refer to psychological evidence that had not been introduced. The prosecutor compared Szadziewicz's behavior and his defense theory to the way people usually behave. She clearly established this frame of reference by talking about the "real world," discussing the common behavior of witnesses ("people don't just get up here and lie unless they have a reason to lie"), exposing the inherent implausibility of

Szadziewicz's story about his plan to burn the drugs if police caught him, and characterizing Szadziewicz's explanation as unreasonable. Nothing in the prosecutor's argument suggested she had psychological information about Szadziewicz that jurors had not heard. Her argument was instead a fair comment on Szadziewicz's testimony about the lighter fluid and matches and a defense argument that Davis testified falsely about having seen Szadziewicz wiping his knife clean. There was nothing improper in the prosecutor's argument.

7.  *The trial court did not violate the confrontation clause by preventing inquiry into the circumstances surrounding one of Davis's prior convictions.*

On direct examination, Davis testified he was in a residential treatment program for cocaine addiction. He also admitted that he had a 1986 felony conviction for robbery and a 1992 misdemeanor conviction for receiving stolen property. On cross-examination, defense counsel delved further into the issue of Davis's addiction. Davis testified that he had been addicted to crack cocaine, that crack cocaine might cause hallucinations, and that he previously had been sober but had "[fallen] off the wagon" while living in the Frontier Hotel. Davis denied, however, that he was using cocaine in January 2005. Defense counsel also asked Davis about his veracity:

"Q. Do you consider yourself to be a truthful person?

"A. Yes, sir, now.

"Q. When were you not a truthful person?

"A. When I was in the midst of my disease.

"Q. Okay. Were you in the midst of your disease when you received stolen property back in 1992?"

The court prevented Davis from answering: "It's not relevant. It's not necessary. It's 352. [¶] Ladies and gentlemen, the fact that the witness has a prior conviction or in this case, two convictions, [is] to be considered by you only on the reflection of weighing his credibility, for that person only. We're not going to explore these events. We're not going to allow this line of questioning to go further."

▮ Szadziewicz contends the court violated the confrontation clause by preventing Davis from answering. The constitutional right of confrontation includes the right to cross-examine adverse witnesses on matters reflecting on

their credibility. (*People v. Quartermain* (1997) 16 Cal.4th 600, 623 [66 Cal.Rptr.2d 609, 941 P.2d 788].) However, the confrontation clause guarantees only an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense wishes. (*Delaware v. Fensterer* (1985) 474 U.S. 15, 20 [88 L.Ed.2d 15, 106 S.Ct. 292].) Judges retain wide latitude to impose reasonable limits on cross-examination. (*People v. Quartermain, supra,* 16 Cal.4th at p. 623.) Confrontation rights are not violated unless a defendant shows that the prohibited cross-examination would have produced a significantly different impression of the witness's credibility. (*People v. Frye* (1998) 18 Cal.4th 894, 946 [77 Cal.Rptr.2d 25, 959 P.2d 183].)

█ When a party impeaches a witness with evidence of a prior conviction, the scope of inquiry does not extend to the details of the underlying offense or its surrounding circumstances. (*People v. McClellan* (1969) 71 Cal.2d 793, 809 [80 Cal.Rptr. 31, 457 P.2d 871]; *People v. Shea* (1995) 39 Cal.App.4th 1257, 1267 [46 Cal.Rptr.2d 388].) The trial court's limitation of cross-examination here was entirely reasonable and well within its power. Any testimony by Davis that he was or was not in the "midst" of his addiction at the time of his 1992 misdemeanor conviction would not have produced a significantly different impression of his credibility. Davis already had admitted having had a relapse of his cocaine addiction shortly after the crime at issue. He also had admitted convictions for robbery and receiving stolen property. Defense counsel cross-examined Davis at length about what he had seen that morning. Whether Davis had been using cocaine at the time of his misdemeanor conviction 13 years earlier was almost completely irrelevant. In fact, Davis's drug use at that time might have *diminished* the 1992 conviction's potential to tarnish his credibility: the jury might have believed him less culpable due to his addiction.

The trial court's limitation on cross-examination did not violate the confrontation clause.

8. *Szadziewicz's concurrent life sentences are not unconstitutionally disproportionate to his very serious, violent crimes.*

Szadziewicz contends his sentence is so disproportional that it violates the state and federal constitutions. He raised this argument in the trial court, where it was rejected.

a. *Szadziewicz's arguments*

Szadziewicz bases his claim on appeal on the defense sentencing memorandum filed in the trial court and its attachments, which he incorporates by

reference. The memorandum argued for leniency based on Szadziewicz's motive in committing the offenses; his age of 53 at the time of sentencing; his lack of a criminal record; the sentiments expressed in letters from his wife, daughter, in-laws, and others; and the opinion of an evaluating psychiatrist.

The letters by Mrs. Faith Szadziewicz characterized the charges as "absurd" and attacked the prosecutor, defense counsel, and jury. She insisted that her husband was not guilty and only acted out of love and concern for his daughter. She praised his character and argued that he was a productive member of society. She complained that his incarceration harmed her financially and wasted his talents. She asserted that Szadziewicz's incarceration had adversely affected his health and her own and that jail was "too dangerous" for him. She claimed that Rossmeisl suffered no permanent damage. A letter written by Fay Szadziewicz said that appellant was a good father, confirmed that she told him she required proof that Rossmeisl was using drugs to end the relationship, and argued that Szadziewicz was "inappropriately charged and unjustly convicted of" the charges. Fay did not say in her letter why she had not appeared to testify at trial.

Szadziewicz's in-laws wrote that he was a kind and gentle person who was trying to protect his daughter. Two men—friends of Szadziewicz, apparently—wrote similar letters. Szadziewicz's self-described "good buddy" Frank Steffak wrote of his honesty and integrity. He also said that Szadziewicz had confided to him his concern over his daughter's relationship with Rossmeisl.

A priest with the Restorative Justice Detention Ministry of the Archdiocese of Los Angeles wrote that Szadziewicz was remorseful and had admitted his actions were wrong. The priest argued incarceration would not benefit Szadziewicz or society, and would only burden the taxpayers.

A letter from a psychiatrist to defense counsel conveyed the results of his evaluation of Szadziewicz. The doctor characterized Szadziewicz as "rather mild-mannered" and the offenses as "out of character." The doctor believed Szadziewicz showed considerable remorse. He opined that Szadziewicz "snapped" to protect his daughter and presented no danger to society.

Finally, Szadziewicz submitted a letter purportedly from Rossmeisl. It urged the court to consider an alternative to a lengthy prison sentence, so that Szadziewicz could make restitution. The letter also opined that an alternative sentence would be better from "a rehabilative [sic] stance."

b. *Analysis under the United States Constitution*

Historically, Eighth Amendment proportionality analysis focused on the gravity of the offense and the harshness of the penalty, the sentences

imposed on other criminals in the same jurisdiction, and the sentences imposed for commission of the same crime in other jurisdictions. (*Solem v. Helm* (1983) 463 U.S. 277, 292 [77 L.Ed.2d 637, 103 S.Ct. 3001].) However, in *Ewing v. California* (2003) 538 U.S. 11 [155 L.Ed.2d 108, 123 S.Ct. 1179], a majority of the United States Supreme Court concluded that in noncapital cases, the Eighth Amendment either contains only a narrow proportionality principle (Chief Justice Rehnquist and Justices O'Connor and Kennedy) or that it contains no proportionality principle at all (Justices Scalia and Thomas). (*Ewing,* at pp. 20, 31–32.) Under the narrow proportionality principle recognized by the plurality, the Eighth Amendment does not require strict proportionality between the offense and the resulting sentence and does not mandate comparative analysis within or between jurisdictions. (*Ewing,* at p. 23.) Rather, it forbids only extreme sentences that are grossly disproportionate to the crime. (*Ibid.*) In weighing the gravity of the defendant's offenses, a court must consider both his criminal history and his current felony. (*Id.* at p. 29.) The *Ewing* plurality noted that, outside the capital context, successful challenges to the proportionality of a particular sentence are exceedingly rare. (*Id.* at p. 21.) Without comparing Ewing's third-strike sentence of 25 years to life[4] with the punishment for other crimes in California or the punishment for the same crime in other states, the court found the case before it was not one of the rare cases in which a proportionality challenge could succeed. (*Ewing,* at pp. 29–30.) The sentence, the Court said, was "justified by the State's public-safety interest in incapacitating and deterring recidivist felons, and amply supported by [Ewing's] own long, serious criminal record." (*Ibid.*)

Despite the attempts of Szadziewicz and his supporters to minimize his crimes, they were extremely grave. He attacked Rossmeisl's face and neck with a sharp blade as Rossmeisl lay in bed. He sliced a large number of long, deep cuts into Rossmeisl's face, causing paralysis in one cheek, severe bleeding, and scarring. He also stabbed Rossmeisl's hand severely and cut Rossmeisl's torso and his neck, close to vital blood vessels. Szadziewicz's conduct—he twice blocked the door to keep Rossmeisl from escaping and he carried lighter fluid and matches with him—confirmed his intent to disfigure and kill Rossmeisl. Szadziewicz's argument in the trial court and on appeal depends on the court accepting his version of events and his explanation for the contents of his bag. Neither the trial court nor this court is required to accept Szadziewicz's story of what happened. The jury's verdicts on the attempted murder and aggravated mayhem charges, and its finding that the murder attempt was willful, deliberate, and premeditated, plainly reveal that the jury did not accept Szadziewicz's testimony that he merely defended himself during a struggle for control of his box cutter.

---

[4] Ewing's commitment offense was shoplifting. He previously had been convicted of three first degree burglaries and one first degree robbery.

Szadziewicz's claimed motive for committing the crimes—concern for his daughter—does not detract from their gravity or make his sentence grossly disproportionate to the crimes. While his prior clean record and his age are factors in his favor, they are far from determinative. (*People v. Gonzales* (2001) 87 Cal.App.4th 1, 17 [104 Cal.Rptr.2d 247]; *People v. Martinez* (1999) 76 Cal.App.4th 489, 497 [90 Cal.Rptr.2d 517].) In this case, the seriousness of the crime and the circumstances surrounding its commission substantially outweigh these factors. Similarly, the combined effect of Szadziewicz's age and the length of the sentence are of no consequence. (*People v. Byrd* (2001) 89 Cal.App.4th 1373, 1383 [108 Cal.Rptr.2d 243].) The wishes of Szadziewicz's family members and friends, their belief that he was wrongly convicted, and the adverse effects on Szadziewicz's health, his wife's health, and the family finances also have no tendency to establish that his sentence was grossly disproportionate to his crimes. Although these no doubt are substantial and legitimate concerns for Szadziewicz and his family, the same concerns arise in the vast majority of cases in which a defendant is sentenced to prison. They certainly are not unique and are of no constitutional relevance.

Accordingly, Szadziewicz's sentence is not the rare, extreme sentence that is grossly disproportionate to the crimes. It does not violate the Eighth Amendment.

### c. *Analysis under the California Constitution*

The basic test of a cruel or unusual punishment under the California Constitution is whether it is so disproportionate to the crime as to shock the conscience and offend fundamental notions of human dignity. (*People v. Dillon* (1983) 34 Cal.3d 441, 478 [194 Cal.Rptr. 390, 668 P.2d 697]; *In re Lynch* (1972) 8 Cal.3d 410, 424 [105 Cal.Rptr. 217, 503 P.2d 921].) The main technique of analysis is to examine the nature of the offense and of the offender. (*Dillon, supra,* 34 Cal.3d at p. 479.) The court must consider both the nature of the offense in the abstract, and the facts of the crime in the particular case, including factors such as motive, the way the crime was committed, the extent of the defendant's involvement, and the consequences. (*Ibid.*) As to the offender's nature, the question is whether the punishment is "grossly disproportionate to the defendant's individual culpability as shown by such factors as his age, prior criminality, personal characteristics, and state of mind." (*Ibid.*) Szadziewicz has the burden of showing that his punishment is unconstitutional. He must overcome a considerable burden in convincing us that his sentence is disproportionate. (*People v. Weddle* (1991)

1 Cal.App.4th 1190, 1196–1197 [2 Cal.Rptr.2d 714]; *People v. Wingo* (1975) 14 Cal.3d 169, 174 [121 Cal.Rptr. 97, 534 P.2d 1001].) We may, but need not, also compare the challenged penalty with punishments for more serious offenses in California and/or with punishments prescribed for the same offense in other jurisdictions. (*Dillon, supra*, 34 Cal.3d at p. 487, fn. 38; *People v. Weddle, supra*, 1 Cal.App.4th at p. 1198, fn. 8.)

■ For the same reasons discussed with respect to Szadziewicz's Eighth Amendment claim, his sentence of life with the possibility of parole does not violate the California Constitution. Despite Szadziewicz's age, lack of a prior criminal record, stable family life, and motive to protect his daughter, the life sentence was not disproportionate to his very serious crimes, much less so disproportionate as to shock the conscience. Aggravated mayhem and willful, deliberate, and premeditated attempted murder are extremely serious crimes and they deserve severe punishment. The Legislature's determination that the appropriate sentence for each of these crimes is life in prison with the possibility of parole reflects that assessment. "The choice of fitting and proper penalties is not an exact science, but a legislative skill involving an appraisal of the evils to be corrected, the weighing of practical alternatives, consideration of relevant policy factors, and responsiveness to the public will; in appropriate cases, some leeway for experimentation may also be permissible. The judiciary, accordingly, should not interfere in this process unless a statute prescribes a penalty 'out of all proportion to the offense' [citations], i.e., so severe in relation to the crime as to violate the prohibition against cruel or unusual punishment." (*In re Lynch, supra*, 8 Cal.3d at pp. 423–424.)

Because Szadziewicz does not base his disproportionality contention on a comparison of punishments, we decline to engage in such a comparison.

### d. *Szadziewicz's constitutional challenge to the Penal Code*

Szadziewicz's opening brief asserts, without supporting argument or citation of authority, that Penal Code sections 1203 and 1203.075 are "unconstitutional in the abstract and as applied to him in this case." In the absence of argument and authority, he has not properly raised this claim. (*People v. Gionis* (1995) 9 Cal.4th 1196, 1214, fn. 11 [40 Cal.Rptr.2d 456, 892 P.2d 1199].) If Szadziewicz intended his argument about the proportionality of his sentence to support this claim, it has no merit for the reasons set forth above.

## DISPOSITION

The judgment is affirmed.

Cooper, P. J., and Rubin, J., concurred.

Appellant's petition for review by the Supreme Court was denied July 9, 2008, S163412.