Filed 12/15/15  P. v. Ramirez CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JESSE RAMIREZ,<br><br>    Defendant and Appellant. | B263448<br><br>(Los Angeles County<br>Super. Ct. No. VA132981) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Brian F. Gasdia, Judge.  Affirmed.

Vanessa Place, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Scott A. Taryle and Eric J. Kohm, Deputy Attorneys General, for Plaintiff and Respondent.

******

Jesse Ramirez appeals from his conviction on four counts of oral copulation with a child 10 years old or younger. (Pen. Code, § 288.7, subd. (b).)[1] The victim, A.M., was four or five years old at the time of the incidents. The court sentenced appellant to a total term of 60 years to life in state prison. Appellant argues this sentence is excessive and constitutes cruel and unusual punishment under the Eighth Amendment and the California Constitution. We disagree and affirm.

## FACTS AND PROCEDURE

Melissa D. began dating appellant in 2010 when her daughter, A.M., was two years old. The couple lived together with A.M. and appellant's two sons, who lived with them three days of the week. Melissa and appellant split up in 2011 because of a domestic violence altercation, but they reconciled. They had a daughter together in 2012, Lyla. Melissa was hospitalized for 10 days in 2012 while she was pregnant with Lyla. She also stayed in the hospital for approximately five days when Lyla was born two months early. When Lyla was two months old, Lyla was hospitalized for four weeks. Melissa stayed with Lyla for those four weeks. Appellant watched A.M. during Melissa's and Lyla's hospitalizations.

After Lyla was born, appellant's behavior toward Melissa and A.M. changed. Melissa said she became virtually "invisible" to him. He no longer referred to A.M. as his daughter, whereas he did before Lyla's birth.

Melissa attended college in the fall of 2013. When she attended class, appellant's relatives would watch A.M. and Lyla while he was at work, and he would pick them up after work and watch them.

In November 2013, A.M. disclosed to Melissa that appellant had forced her to orally copulate him. A.M. initially was hesitant to tell Melissa because she did not "want to get in trouble." She eventually stated that "daddy Jesse" made her "suck his chile to suck the flies off like a frog." "Chile" was what A.M. called a penis because that was the

---

[1] Further undesignated statutory references are to the Penal Code.

term Melissa used in front of children. A.M. said appellant either pulled his shorts down or opened a hole in his shorts. She described how appellant's "chile" looked and said it was "brown with a circle on top." Melissa brought her sister, Amy D., in from another room and asked A.M. to tell Amy D. her account. Amy D. recorded the conversation between the three of them on her cellular phone; the prosecution played portions of the recording for the jury. On the recording, A.M. tells Melissa and Amy D. that appellant "pulls down his pants and then he lets his Chile goes like straight" and she has "to suck it." Appellant gave her candy for doing this. If she refused to do it, appellant would "put [her] in trouble." Appellant asked her to do this when only the two of them and Lyla were home.

After A.M.'s disclosure, Amy D. spoke to A.M. alone when she was bathing A.M. A.M. told her that appellant had touched her inappropriately, and she demonstrated by putting her own finger between the folds of her labia. A.M. said "the stuff that comes out when you are dirty down there" was on appellant's finger after he touched her like that.

Melissa wanted to get Lyla away from appellant immediately following A.M.'s disclosure, so she told him she needed to take Lyla to a photo shoot with her family on the following day. The next day, she took Lyla and A.M. to Amy D.'s home, and the day after that, she went to her apartment while appellant was at work and moved out her belongings. After moving her things and contacting A.M.'s biological father, she contacted the police.

A detective with the Downey Police Department interviewed A.M. at length. The prosecution played portions of the video recording of the interview for the jury. A.M. told the detective that appellant first made her orally copulate him when Melissa was pregnant and in the hospital. Her account to the detective was consistent with the accounts she relayed to Melissa and Amy D.: "He make the hole in his pants, in his shorts, uh huh . . . and then his Chile go straight, uh huh, and then he came and he pushed my head to suck . . . and then he made me open my mouth and then suck it. Suck the Chile out of him. [¶] . . . [¶] . . . And then after that he went into the bathroom, and but for doing that, he always give me candy for doing that." She also said appellant would

3

make her lie on top of him, and on one occasion, she tried to run away from him, but he caught her and forced her to orally copulate him. If she refused to do it, he would threaten to spank her. A.M. made clear that appellant forced her to orally copulate him multiple times. The incidents began when she was four years old and her mother was pregnant with Lyla and in the hospital, and they continued when she was five years old and Melissa was attending school. She thought the incidents happened more than 10 times but less than 15 times.

A.M. testified at trial, by which time she was six years old. She repeated how appellant forced her to orally copulate him, except that she said appellant forced her to do it less than five times, and he only did it when Melissa was at school. She used dolls to demonstrate what he made her do.

Appellant testified in his own defense. He denied ever forcing A.M. to orally copulate him or otherwise touch her inappropriately. Appellant said he "stayed away" from A.M. after Lyla was born because Melissa's mother had been accusing him of molesting A.M. since 2011.

The information charged appellant with four counts of oral copulation or sexual penetration with a child 10 years old or younger, committed between July 24, 2012, and November 17, 2013. The jury found appellant guilty as charged. The court sentenced appellant to consecutive terms of 15 years to life in state prison on each of the counts for a total of 60 years to life.

**DISCUSSION**

We begin by disposing of appellant's contention that we must reverse and remand because the court did not conduct an Eighth Amendment analysis of his sentence. Appellant filed a "motion for a new trial and reduction of sentence re: cruel and unusual punishment," in which he argued that a prison sentence of 60 years to life constituted cruel and unusual punishment under the Eighth Amendment. (Capitalization omitted.) At the sentencing hearing, defense counsel noted that his motion for a new trial included "an 8th Amendment analysis." The court replied: "Yeah. It's an interesting argument and it is part of the motion. It's an interesting analysis. [¶] . . . [¶] So the real question,

4

as pointed out in the sentencing memorandum, is the discretion. Do any of these run concurrent? Do all of them run consecutive? [¶] *So I have looked at the analysis that you raised. I have looked at the 8th Amendment issue*, I have to look at the legislative history and look at what our legislatures did back then and why. A lot of the legislative history, which is usually in the annotated part of a code section, actually is embodied in and contained in a different Government Code section that dealt with the funding aspects of it. [¶] It's kind of an interesting little diversion when I tried to figure out where— what was—what was going on when this act[2] was adopted." (Italics added.)

The court went on to sentence appellant as set forth above. Section 288.7, subdivision (b), provides that the punishment for an adult who engages in oral copulation with a child as young as A.M. "shall be" 15 years to life in state prison, and the jury convicted appellant of four separate counts. The court had discretion to decide whether to impose concurrent or consecutive terms. (§ 669, subd. (a); *People v. Bradford* (1976) 17 Cal.3d 8, 20.)

Here, the court stated in no uncertain terms that it had considered appellant's Eighth Amendment analysis, and it impliedly rejected his argument when it sentenced appellant to 60 years to life. Appellant's argument suggests the court must not only consider the issue, but expressly set forth its analysis of the Eighth Amendment factors on the record. Appellant cites no support for such a position, and we decline to impose this duty, especially when, as here, it is clear the court considered the Eighth Amendment issue as briefed by appellant.

To the extent appellant argues we should reverse because the court failed to state its reasons for imposing consecutive sentences, this argument is not well taken. Quite apart from the Eighth Amendment, California Rules of Court, rule 4.406(b)(5) requires a

---

**2** The "act" to which the court referred was the Sex Offender Punishment, Control, and Containment Act of 2006. (Stats. 2006, ch. 337, §§ 1, 9, pp. 2584, 2590-2591, eff. Sept. 20, 2006.) The statute under which the jury convicted appellant, section 288.7, is part of this act.

court to state its reasons for imposing consecutive sentences. But appellant never objected below when the court failed to state its reasons for consecutive sentencing. A defendant may not claim that the court failed to state its reasons for a sentencing choice for the first time on appeal. (*People v. Boyce* (2014) 59 Cal.4th 672, 730-731.) Doing so forfeits the claim. (*Ibid.*)

Appellant does not fare better when we examine the merits of his Eighth Amendment challenge, which the trial court considered and rejected. Whether a punishment is cruel and unusual is a question of law that we review de novo, though we must view the underlying disputed facts in the light most favorable to the judgment. (*People v. Martinez* (1999) 76 Cal.App.4th 489, 496.) Both the Eighth Amendment and the California Constitution prohibit cruel and unusual punishment (U.S. Const., 8th Amend.; Cal. Const., art. I, § 17), and under both, a sentence may be cruel and unusual if it is grossly disproportionate to the crime committed. (*Graham v. Florida* (2010) 560 U.S. 48, 59-60; *People v. Dillon* (1983) 34 Cal.3d 441, 478.)

Under the federal constitution, "[a] court must begin by comparing the gravity of the offense and the severity of the sentence. [Citation.] '[I]n the rare case in which [this] threshold comparison . . . leads to an inference of gross disproportionality' the court should then compare the defendant's sentence with the sentences received by other offenders in the same jurisdiction and with the sentences imposed for the same crime in other jurisdictions." (*Graham v. Florida, supra*, 560 U.S. at p. 60.) In noncapital cases, a disproportionality challenge is successful only in the "'exceedingly rare' and 'extreme' case." (*Lockyer v. Andrade* (2003) 538 U.S. 63, 73.)

Under the state constitution, a sentence is cruel and unusual if "it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." (*In re Lynch* (1972) 8 Cal.3d 410, 424.) "Only in the rarest of cases could a court declare that the length of a sentence mandated by the Legislature is unconstitutionally excessive." (*People v. Martinez, supra*, 76 Cal.App.4th at p. 494.) "The three techniques often suggested for determining if punishment is cruel and unusual are (1) [examining] the nature of the offense and the

6

offender with regard to the degree of danger present to society, (2) comparison of the challenged punishment with the punishment prescribed for more serious crimes in the jurisdiction, and (3) comparison of the challenged punishment with punishment for the same offense in other jurisdictions." (*People v. Russell* (2010) 187 Cal.App.4th 981, 993.) "The nature of the offense is viewed both in the abstract and in the totality of circumstances surrounding its actual commission; the nature of the offender focuses on the particular person before the court, the inquiry being whether the punishment is grossly disproportionate to the defendant's individual culpability, as shown by such factors as age, prior criminality, personal characteristics, and state of mind." (*People v. Martinez, supra*, at p. 494.)

Appellant concedes that he is not helped by comparative analyses of other crimes in California and the same crime in other jurisdictions; he acknowledges his "sentence is not inherently disproportionate to the crimes of conviction, and is commensurate with similar convictions throughout the state and nation." Thus, the only issue for us to consider is whether his sentence offends constitutional standards in light of the nature and gravity of the offense and the nature of the offender. (*Graham v. Florida, supra*, 560 U.S. at p. 60; *People v. Russell, supra*, 187 Cal.App.4th at p. 993.)

These factors fail to convince us the sentence constitutes cruel and unusual punishment. To begin with, the offense is considerably grave. One court considering lewd acts with children under age 14 (oral copulation, touching genitals and buttocks) explained that the gravity of such an offense is substantial: "Viewed along a spectrum, we may find murder, mayhem and torture among the most grave of offenses and petty theft among the least. Considered in this context, lewd conduct on a child may not be the most grave of all offenses, but its seriousness is considerable. It may have lifelong consequences to the well-being of the child." (*People v. Christensen* (2014) 229 Cal.App.4th 781, 787-788, 806.) The same can be said here, where appellant engaged in oral copulation with a four- or five-year-old child, forcibly pushing her head down and punishing her if she refused to do it. And, even though one act in isolation would be serious, this was not a one-time incident. Appellant committed multiple offenses over a

period of months. (See *id.* at p. 806 ["[D]efendant's offenses were multifold. He was convicted not of one offense, but of five. He molested not one boy, but three. Any one act in isolation was a serious offense. Cumulatively, without a doubt, his offenses were grave."].) Appellant implies that we should not consider his offense to be serious because "there was substantial confusion as to whether there was one act, more than one act, how many times the acts may or may not have occurred, and their effect on the victim," and further, "it does not appear as if there was overwhelming evidence of guilt." This argument is flawed. The jury obviously rejected appellant's version of events in which he never molested A.M. Although there was some conflicting evidence about how often the oral copulation occurred, we view the facts in the light most favorable to the judgment (*People v. Martinez, supra*, 76 Cal.App.4th at p. 496), and in doing so, there was substantial evidence that appellant committed at least the four offenses of which he was convicted. Although at trial A.M. thought the oral copulation happened less than five times, at one point she said it happened between 10 and 15 times. Moreover, we know that appellant had care of A.M. numerous times over the relevant period, when Melissa was either at the hospital for extended stays or regularly attending school.

As to the nature of the offender, appellant emphasizes that he was only 30 years old at the time of his arrest and will be 90 by the time he is eligible for parole, he had only one prior conviction for misdemeanor battery in 2011, and he maintained steady employment.[3] But appellant's age shows that he was not an immature youth and he was capable of acting alone and without cajoling, which he did. A.M., on the other hand, was incredibly vulnerable, susceptible to manipulation, and immature at her age. Melissa entrusted A.M. to appellant's care, and he repeatedly breached that trust. There is no dispute that appellant had only a minor criminal record, but the lack of a serious criminal record is far from determinative. (*People v. Szadziewicz* (2008) 161 Cal.App.4th 823,

---

**3** Appellant had been a delivery person for a flooring company for a little over a year at the time of his arrest.

8

845; *People v. Felix* (2003) 108 Cal.App.4th 994, 1001.)  In short, appellant committed serious offenses against a child of tender years who was akin to family.  The disproportionality principle reserves a constitutional violation for extraordinary cases. This is not such a case.

## DISPOSITION

The judgment is affirmed.


FLIER, J.

WE CONCUR:


BIGELOW, P. J.


GRIMES, J.


9