Filed 10/9/13  P. v. Ranger CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>MICHAEL SHAUN RANGER,<br><br>    Defendant and Appellant. | B242414<br><br>(Los Angeles County<br>Super. Ct. No. GA083271) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Darrell Mavis, Judge.  Affirmed.

Law Firm of Helen Simkins Irza and Helen S. Irza, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, James William Bilderback II and Stephanie C. Santoro, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Michael Shaun Ranger appeals from his conviction of assault with a deadly weapon causing great bodily injury. He contends that the trial court erred in failing to instruct the jury concerning the effect of the victim's antecedent threats on defendant's right to self defense. Defendant also contends he received ineffective assistance of counsel due to his trial attorney's failure to request two pinpoint instructions, one regarding the effect of antecedent threats on the measures taken in self-defense, and the other defining excessive force as "clearly vindictive." We find no error and conclude that defendant has not established ineffective assistance of counsel. We affirm the judgment.

## BACKGROUND

**Procedural history**

Defendant was charged with assault with a deadly weapon in violation of Penal Code section 245, subdivision (a)(1).[1] The information specially alleged pursuant to section 12022.7, subdivision (b) that defendant personally inflicted great bodily injury upon the victim and that the injury caused the victim to become comatose due to brain injury and to suffer paralysis. A jury convicted defendant as charged and found true the special allegation. On May 14, 2012, the trial court sentenced defendant to a prison term of eight years, comprised of the middle term of three years, plus five years for the great bodily injury. The court imposed mandatory fines and fees and awarded defendant a total of 46 days of presentence custody credits, consisting of 40 days actual custody credit and six days local conduct credit. Defendant filed a timely notice of appeal.

**Prosecution evidence**

Victim Paul Chua (Paul) and his six siblings[2] jointly owned a food importing and distributing company and a retail store. Paul was the president of the company from

---

[1]    All further statutory references are to the Penal Code, unless otherwise indicated.

[2]    Paul testified that his six siblings, from oldest to youngest, were Gene, Virginia, Rosalina, Susie, Gina, and William. We refer to them by their first names to avoid confusion.

2000 to early 2011, while his younger brother William managed the retail store. Paul and William were neighbors. William lived in one unit of a duplex with his wife Jessie and his close friend, defendant lived in the other unit. Paul lived just two doors away from the duplex with his wife Wilhelmina and Kirby, the youngest of his three adult daughters.

Paul's relationship with his siblings deteriorated in 2010 due to a business dispute and when one of Paul's three daughters started a competing business in Washington, a great deal of hostility and ill will resulted in the family. Wilhelmina's employment with the company was terminated in 2010, and a majority of the siblings voted to remove Paul from his position as president in February 2011, electing his sister Susie in his place. Although Paul's removal caused his relationship with Susie, Virginia, and William to worsen, their disagreements never escalated into a physical fight. Paul avoided his siblings and stopped going into work, but Kirby and Kem (Paul's oldest daughter) continued to work at the company.

On March 28, 2011, William brought his mother to the office to visit. When Kirby did not give her grandmother a greeting kiss, William scolded her and called her worthless and disrespectful. This made Kirby cry and she left work. When Paul heard about the incident and could not reach Kirby, he went to the office to confront William. William had left by the time Paul arrived so he tried telephoning William who failed to answer the calls. Paul became more upset and vented his frustration by punching a wall at the business several times. Paul testified when he finally reached William at 7:00 p.m., he told William that he could yell at Paul but should not yell at Paul's children in front of others. Paul denied saying he would hurt William or anyone else.

That evening, Paul went out to dinner with his sister Gene and others where he had one and a half glasses of whiskey and water, about half what he normally drinks with dinner. Paul arrived home around 10:00 p.m. and parked in his driveway. He testified he felt blows on the back of his head but saw no one until after he fell, looked up, and saw defendant tapping a long-handled flashlight on his open palm, saying "Get up." When he got up, defendant hit Paul again on the top of his forehead near his left eye. Paul fell again; defendant bent down and hit Paul multiple times on the head and face with the

3

flashlight. Paul thought he blacked out sometime during the attack, and also remembered walking backward onto the lawn as defendant advanced. Paul saw Kirby, asked her for help, and heard defendant say "Bitch."

Paul had known defendant for at least five years, during which time he had never had a verbal or physical fight. Paul denied feeling intoxicated when he drove home that night and that he went near or broke a window in William's house. Paul claimed he was empty-handed and did not hit defendant.

When Kirby and Wilhelmina heard screaming and saw Paul outside needing help, Wilhelmina called 911 and Kirby went to her father's side and held him to keep him still. Kirby testified when she saw defendant, she said, "What did you do? Leave my dad alone"; defendant angrily shouted, "Fuck you, bitch. I'll fucken [*sic*] kill him." Paul appeared to Kirby to be scared, not angry, and although she had seen her father upset before, she had never seen him in a rage.

Paul was taken to the hospital where he underwent surgery the same night. He remained in the hospital for almost a month. He was in a coma the first three days, and for some time after leaving the hospital he suffered memory loss and could not read, spell, or pronounce names. After a month of rehabilitation Paul was able to walk with the help of a walker, but at the time of trial he was still forgetful and complained of frequent headaches and dizziness. The parties stipulated that defendant personally inflicted significant and substantial physical injury to Paul, and that defendant personally inflicted great bodily injury that caused Paul to become comatose due to brain injury.

**Defense evidence**

Susie testified she and her brother William were close but she was not on speaking terms with Paul in March 2011. Susie had known defendant, a very good friend of William's, for about 10 years. On March 28, while she was at work, she heard banging on the wall and saw Paul looking angry. Susie did not see Paul hit the wall but later saw the holes. Susie and William went to the police station together to request a restraining order, but were told to apply at the courthouse the next day. William decided against

4

filing a complaint with the police after learning that it would result in Paul's arrest. Susie believed Paul would respect a restraining order and did not want to have him arrested.

Susie heard one of Paul's telephone messages that evening. She heard Paul say he would protect his family to the very end and was not afraid to be put in jail. Paul sounded upset and angry, so Susie suggested to William that he not go home. Sometime after March 28, defendant told Susie that he and Paul exchanged words over a broken window, that Paul attacked him by hitting defendant on his bad shoulder, resulting in a fight in which defendant used a flashlight. Defendant apologized for hurting her brother.

Glendale Police Officer Richard Pesti, one of the officers who was called to the crime scene, testified that he spoke to Paul and noticed an odor of alcohol about him, but could not tell whether Paul was intoxicated. Without mentioning a broken window, Paul told Officer Pesti that he had gone to his brother's house and argued with a man who then attacked him. Paul was bleeding heavily and Officer Pesti saw lacerations on his head. Paul was staggering and swaying, his speech was mildly slurred, and he was shaking; he was not making complete sense, but was responsive to the officer's questions. As their 15- or 20-minute conversation progressed, Paul's slurring got worse, he was harder to understand, his head hurt, and he became dizzy. By the time the paramedics arrived, Paul was incoherent, was drifting in and out of consciousness, could not focus or answer any more questions, and suffered whole body tremors. Paul was unable to see defendant well enough from a few feet away to identify him.

William testified that he and Paul had disagreed about the business for a couple years and had discussed its division. William had known defendant for 12 or 13 years, and they were very close friends, like brothers. William married Jessie in 2004, the same year that defendant came to live with him.

Regarding his March 28 exchange with Kirby, William reported that he brought his mother to the office to visit and Kirby failed to "do the blessing" by kissing her grandmother. When Kirby did not respond to William's question, "Why?" he ordered her to do so and she complied, but with "attitude" and a "long face." William told Kirby several times not to be rude to her grandmother. Later, after he left, one of his sisters

5

called and told him about what Paul had done at the office.  William returned, saw the holes in the wall, and felt frightened.  He and Susie then went to the police station to request a restraining order.  The police offered to arrest Paul, but William declined because their mother had just been released from the hospital.

William went out to dinner with Susie without going home first.  Before they reached the restaurant, Paul called William and yelled at him in Tagalog, which in English would be something like, "You son of a bitch, I am going to get you."  William received two or three more calls from Paul during the evening and let them go to voicemail.  In Susie's presence he played the 9:00 p.m. message in which Paul said, "You pig, you pig, you faggot, don't fight with my -- don't fight with the girl, fight with me. Fight with me.  You -- even you and Shaun";[3] and, "I'm not afraid to get into jail." William interpreted this message as a threat.

Frightened by the calls, William telephoned Jessie and defendant several times, said that Paul was upset, and told them not to open the door if someone banged on it, but to call 911.  William could not remember whether he told defendant about the holes in the wall.  He did remember telling defendant that Paul was upset, had called William, made threats, and left an inappropriate message.  William and Susie then watched an office video of William's interaction with Kirby and of Paul punching the wall, which made William so nervous he shook.  Jessie called and asked William to come home because his brother had broken the window and the police were there.  When William arrived, defendant was detained and in handcuffs.

The defense also called Glendale Police Detective Mike Wenz, who interviewed defendant that night.  Defendant told Detective Wenz he had been sleeping when he heard a window shatter, ran outside, slipped, fell, and hurt his arm.  Detective Wenz observed dirt on defendant's T-shirt, and an abrasion on his arm.  No blood or glass was found on defendant's clothing or on Paul's shoes and socks.

---

**3** William called defendant "Michael," while other family members called him "Shaun."  In addition, some family members referred to defendant as William's "domestic partner" or "boyfriend."

6

Defendant testified he had known the Chua family for 13 years and he and William had been very good friends for that length of time. Defendant was aware of the hostility among the siblings with regard to the business. He usually lived in a separate unit of William's duplex, although at that time he, William, and Jessie were all living together in one unit while the other was being remodeled. Defendant worked as a handyman for William and took care of many things for the entire family. He attended family gatherings at William's invitation and had a good but casual relationship with Paul. Although defendant did not see much of Paul in 2011 due to the family disagreement, they had never before had a disagreement, verbal argument, or physical fight.

Defendant testified that William telephoned him twice during the evening of March 28, 2011. The first call came in about 6:30 p.m. and the second call about 30 minutes later. William said that Paul was angry and might bang on the door and if so, to ignore it, keep the door locked, and call 911. The call was brief, and William did not go into any detail. William did not say that Paul had called earlier in the day, that he had left a voicemail, or that he had called William a pig and a faggot; nor did William say anything about the incident with Kirby. William did not seem frightened on the phone, his tone was calm and normal, and defendant was not afraid. Defendant explained, "I just took it as a -- as a warning that somebody might be coming, beat on the front door, but I never took it as some sort of threat."

Two hours later, defendant heard glass breaking and Jessie screaming. Still unafraid, defendant got out of bed, ran to the front door, told Jessie to call 911, picked up the flashlight from where it was always kept by the front door, and went outside. After he saw Paul walking quickly away while ducking down behind the nearby bushes, defendant saw the broken window. Defendant did not see anything in Paul's hands. Disappointed and angry, defendant stepped off his porch, fell, dislocated his shoulder, and suffered an abrasion on his arm.

As Paul was on the sidewalk in the neighbor's driveway, walking upright toward his own home in a calm manner, defendant called to Paul and asked Paul what he had

7

done. Defendant claimed he was upset about the window but not afraid or angry when he confronted Paul on the sidewalk. Defendant denied he struck Paul from behind or on the back of the head at all. When the two men were about a foot apart, Paul turned around, appeared to be in a drunken rage, and screamed at defendant in Tagalog. Paul took a swing at defendant, but defendant did not feel a blow land on him. Defendant nevertheless felt disabled by the pain in his shoulder and instinctively reacted by hitting Paul twice with the flashlight. Defendant testified that he aimed two quick strikes at Paul's forehead in a side to side motion, adding, "Obviously I wasn't aiming. I was just swinging in reaction." Defendant explained that Paul was swinging wildly, and he used the flashlight to deflect Paul's fists, not really aiming at his head. Defendant claimed he did not hit Paul hard with the first blow and did not hit him more than twice. He denied using a sweeping, over-the-head motion, and denied that Paul ever fell to the ground.

Defendant was not sure whether he actually struck Paul with his first swing of the flashlight as he saw blood only after the second strike. Defendant claimed he stopped and went back to his house to call 911 as soon as he saw that Paul was bleeding and was clearly injured. He then saw Paul go toward his porch, then turn toward defendant, taunting him by saying, "Come on, Shaun, come on," while Kirby tried to hold Paul back. Defendant denied yelling at Kirby or saying "Fuck you, bitch, I'm going to fucken kill him." When Kirby said, "Shaun, what have you done?" he did not respond because was embarrassed. When defendant entered his house, Jessie had reached 911 and he took the telephone from her. Defendant told the 911 operator to send paramedics because Paul was bleeding.

The prosecutor played a recording of the 911 call for the jury. There were no requests for paramedics in the recording, although minor portions were unintelligible. Defendant admitted his was the only male voice on the recording. He described Paul to the 911 operator and said that Paul "came over here and busted in the damn window," that he was "standing right out here right now," and that he had been threatening his brother all day. Defendant then yelled such things as: "Fuck you, don't come over here and attack us"; "The police are coming right now to take your ass to jail Paul"; "Look

what the fuck he did"; "Come over here and smash the fucking window"; and "Fucking moron."

Defendant admitted he sounded extremely angry in 911 call, but explained that he was in pain and the experience was traumatic. He denied he was upset enough over the window to want to hurt Paul. Defendant claimed the pain in his shoulder was excruciating, that he could not lift his arm for two days, and that he went to doctor about it the next day.

When defendant was interviewed by police that night, he admitted he initially did not tell the officers he had used a flashlight because he was afraid to tell them that he used something other than his fists. Defendant told about the flashlight only after an officer looked at his hands and said they could not have inflicted such wounds. Defendant also told the officers he fell after he hit Paul once with the flashlight. Defendant admitted that none of his injuries resulted from Paul's actions.

**Rebuttal**

Detective Petros Kmbikyan, who assisted in processing the crime scene, testified that no blood drops were found near William's duplex. Most of the blood observed was concentrated in Paul's driveway next to his car and the sidewalk in front of the house between Paul's house and William's duplex.

Detective Wenz, who questioned defendant in a recorded interview beginning about 12:30 a.m. that night, testified he noted the abrasion on defendant's left arm but saw no other injuries. Defendant complained that his shoulder was hurting but he did not request medical attention. The recording of the interview was played for the jury. The prosecutor stopped the recording occasionally for Detective Wenz to describe defendant's gestures, such as when defendant showed the detective how Paul came toward him by raising both arms above his head. Detective Wenz demonstrated in court by raising both arms outstretched above his head, wiggling his fingers, and shaking his hands. Defendant did not complain of pain in his shoulder and did not appear to have any difficulty raising his arms in the interview. In addition, defendant claimed he "tagged" Paul once with the flashlight by giving him just a "snap on the side of the head." Defendant demonstrated

9

by pointing to his left temple and moving his finger down to the jaw line. Defendant also told Detective Wenz he "tapped" Paul twice with the "butt end" of the flashlight, and he pointed to the bulb end of the flashlight in a photograph to indicate the part he held in his hand.

Defendant told Detective Wenz that when the window was broken he came out of the house screaming and cursing, and saw Paul running away from William's house; but then Paul turned and came back toward defendant. Defendant said he felt threatened by Paul as he first came toward defendant flailing his arms, and added "[N]ormally Paul is not a threatening person, I shouldn't have took it as threatening, but the fact that -- they had been fighting and feuding so much and then he had been calling and threatening already Willie and stuff . . . that when he turned around and came at me, I just took it as green light, go, you know . . . and I just went into a defensive posture." (Original ellipses.)

Defendant told the detectives that "everything started" when he fell and hurt his shoulder, and Paul stood over him yelling as he was trying to get up. Defendant then said he had already struck Paul once before he fell, and that Paul did not assault him while he was on the ground. Defendant explained that he hit Paul once, then slipped, "jumped into a defensive posture and . . . whacked him again." Defendant said Paul did not take swings at him prior to the first flashlight blow, but instead came at him like a drunk person, "like aah" with his arms in the air. It was then that defendant hit Paul with the flashlight, slipped, and fell. Defendant said he hit Paul because Paul was screaming and his behavior appeared threatening. Defendant "anticipated that he was about to throw in a punch." Later in the interview, defendant again claimed both he and Paul threw punches and that he was injured as a result of their fight; but defendant then said he used the flashlight instead of throwing punches because his shoulder was hurt; and later he admitted he hurt his shoulder when he slipped and fell right after coming out of his house.

Defendant told the detectives that when William called to tell him not to open the door, William said that Paul had been threatening him all day, but did not "go into the

actual language." Defendant imagined "they were probably very empty threats." William also told defendant that Paul went into a tirade and beat on the walls. Defendant said, "And everything and so that kinda like scared me -- that's kinda the reason why I was on my guard with Paul . . . last night." Defendant said he did not mean to use the flashlight as a weapon when he picked it up and would have used his fists had he not been carrying it; "it was a self-defense mechanism." He told Detective Wenz he was not trying to hurt Paul and was very sorry.

## DISCUSSION

### I. Self-defense instructions

Defendant contends the trial court erred in failing to include the language of CALCRIM No. 3470 which relates to antecedent threats or violence by the victim.[4] During trial, defense counsel requested the additional language by providing the court a copy of CALCRIM No. 3470 with the victim's name (as suggested in brackets), as follows:

> "The defendant's belief that he was threatened may be reasonable even if he relied on information that was not true. However, the defendant must actually and reasonably have believed that the information was true. [¶] If you find that the defendant knew that Paul Chua had threatened or harmed others in the past, you may consider that information in deciding

---

[4]      As read by the trial court, CALCRIM No. 3470 defined lawful self-defense, as follows: "The defendant acted in lawful self-defense if: one, the defendant reasonably believed that he was in imminent danger of suffering bodily injury; two, the defendant reasonably believed that the immediate use of force was necessary to defend against that damage [*sic*]; and, three, the defendant used no more force than was reasonably necessary to defend against that danger. Belief in future harm is not sufficient no matter how great or how likely the harm . . . is believed to be. The defendant must have believed that there was imminent danger of violence to himself. Defendant's belief must have been reasonable, and he must have acted because of that belief. The defendant is only entitled to use that amount of force that a reasonable person would believe is necessary in the same situation. If the defendant used more force than was reasonable, the defendant did not act in a lawful self-defense. When deciding whether the defendant's beliefs were reasonable, consider all of the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed. If the defendant's beliefs were reasonable, . . . the danger does not need to have actually existed."

11

whether the defend[an]t's conduct and beliefs were reasonable. [¶] If you find the defendant received a threat from someone else that he reasonably associated with Paul Chua, you may consider that threat in deciding whether the defendant was justified in acting in self-defense."

When the trial court read CALCRIM No. 3470, the three requested paragraphs were not included.

A trial court is required to give an instruction when the defendant requests it, so long as substantial evidence has been presented that the defendant knew about antecedent threats or assaults and reasonably and honestly believed in the danger posed by them, and his conduct was reasonably influenced by them. (*People v. Moore* (1954) 43 Cal.2d 517, 530-531; *People v. Pena* (1984) 151 Cal.App.3d 462, 475; *People v. Torres* (1949) 94 Cal.App.2d 146, 151-153.)

Defense counsel did not mention the omission, even though the trial court gave counsel a second opportunity to propose any additions or modifications after it had read the instructions to the jury. Respondent contends that defendant has forfeited the issue by failing to object or to press for a ruling. As defendant points out, because the trial court was required to rule on the written instruction request, the failure to do so must be deemed a refusal and no further objection or exception was required to preserve the issue for appeal. (See *People v. Torres*, *supra*, 94 Cal.App.2d at pp. 150-151; §§ 1127, 1176.) We observe however, that defense counsel's closing argument included no suggestion that defendant was influenced by Paul's threats or behavior earlier in the day. Counsel mentioned Paul's drinking, wall punching, and threats only to support an argument that Paul was the aggressor and that defendant struck Paul reflexively in reaction to Paul's drunken attack with his fists. It is thus likely that defense counsel placed little significance on the special instruction.

In any event, if counsel had pressed for a ruling, the trial court would not have erred in refusing to instruct the jury to consider antecedent threats in determining the reasonableness of defendant's belief in the necessity of self-defense. To justify the instruction, there must be substantial evidence of prior assaults on the defendant or

12

threats to cause the defendant death or great bodily harm. (See *People v. Gonzales* (1992) 8 Cal.App.4th 1658, 1663-1664.) Defendant points to evidence that Paul made such threats to William as: "I am going to get you"; "don't fight with the girl, fight with me"; and "I'm not afraid to get into jail." Substantial evidence is evidence that would be sufficient, if believed, to enable a reasonable jury to find a reasonable doubt as to the defendant's guilt. (*People v. Salas* (2006) 37 Cal.4th 967, 982-983.) Such vague threats to "get" William and to risk going to jail do not amount to threats to defendant of death or great bodily harm. The only evidence of a prior assault against anyone was William's testimony that his brother hit him once in 1986.

Moreover there was a little evidence that William communicated such statements. While William testified he told defendant about the threats, he did not specify the threats. Nor did William share his interpretation of the words; he merely told defendant that Paul "did some nasty word." Defendant told detectives that William had called to say that Paul had been threatening him all day, but did not give specifics, and defendant surmised that "they were probably very empty threats." Although defendant was on his guard and "kinda scared" by the wall punching, there was no evidence he interpreted that behavior as a threat directed at him or William. At most, defendant was aware that Paul may have threatened to beat on William's door.

Defendant also told detectives that he did not consider Paul a threatening person and did not feel threatened until after he had approached Paul, when Paul turned and flailed his arms. Defendant testified when William called to warn him that Paul might beat on the door, defendant did not interpret it as a threat. He was angry, not afraid, when he walked toward Paul to ask about the broken window. Defendant told detectives that he took the flashlight outside for use as a weapon. Finally, defendant did not testify his actions were influenced by any threats Paul may have made, rather he claimed his blows with the flashlight were an instinctive reaction to Paul's fists coming at him.

Trial courts should not give instructions that are unsupported by substantial evidence. (*People v. Marshall* (1997) 15 Cal.4th 1, 39-40.) Thus, where defendant's own uncontradicted testimony and statements to detectives established that there had

13

been no threats of bodily harm against defendant, defendant knew of no such threats, and the blows with the flashlight were not induced by any such threats, we conclude that an instruction to consider whether defendant was influenced by antecedent threats was properly refused.

Regardless, if the court had erred in failing to give the requested instructions, the omissions were harmless. First, we reject defendant's assertion that the influence of antecedent threats was the "crux of his defense." Defense counsel argued that defendant heard that Paul had behaved aggressively and had made threats, but did not argue that Paul had previously committed an assault or had threatened to inflict great bodily injury on defendant. Nor did counsel argue that William's telephone calls gave defendant any reason to think that Paul would harm him. Counsel argued that Paul, a normally "decent, quiet, nice man," was so drunk and harbored such "incredible resentment for his family" that he acted "like a crazy man" and "threw a punch" at defendant. Counsel's conclusion and the "crux" of the argument was that Paul, not defendant, was the initial aggressor, and that defendant acted instinctively to protect himself against Paul's attack.

Second, any defense theory based on the influence of antecedent threats was refuted by overwhelming evidence in the form of defendant's own testimony and statements. Defendant admitted he angrily approached Paul to ask him about the window; and he admitted what he felt about Paul's "empty" threats and wall punching tirade was being "kinda" scared and on his guard. Assuming the jury believed that Paul had broken the window in a drunken rage, lied about it and about being struck from behind in his own driveway, and that he attempted to punch defendant, it remains that defendant approached Paul as Paul was walking back, empty-handed toward his own home and no longer on William's property. After defendant had severely injured Paul, defendant's extreme anger over the broken window could still be discerned in his 911 call, during which he warned Paul not to "come over and attack us" but made no claim that Paul had attacked him.

Finally, there was no evidence of antecedent assaults. The vague threat to "get" William, Paul's demand that William fight with him not Kirby, and his statement that he

14

was not afraid "to get into jail" were not substantial evidence of a threat to inflict great bodily injury on defendant. Indeed, defense counsel did not argue that there was such evidence. We conclude beyond a reasonable doubt that the asserted error did not contribute to the verdict. (See *Chapman v. California* (1967) 386 U.S. 18, 24.)

## II. Effective assistance of counsel

Defendant contends that his trial counsel rendered ineffective assistance by failing to request two pinpoint instructions regarding the amount of force a defendant is entitled to use in self-defense. The Sixth Amendment right to assistance of counsel includes the right to the effective assistance of counsel. (*Strickland v. Washington* (1984) 466 U.S. 668, 686-674; see also Cal. Const., art. I, § 15.) "Generally, a conviction will not be reversed based on a claim of ineffective assistance of counsel unless the defendant establishes *both* of the following: (1) that counsel's representation fell below an objective standard of reasonableness; *and* (2) that there is a reasonable probability that, but for counsel's unprofessional errors, a determination more favorable to defendant would have resulted. [Citations.] If the defendant makes an insufficient showing on either one of these components, the ineffective assistance claim fails." (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1126.)

First, defendant contends his counsel should have requested the following optional language in CALCRIM 3470: "Someone who has been threatened or harmed by a person in the past is justified in acting more quickly or taking greater self-defense measures against that person." (Italics omitted.)

There was no evidence that Paul had harmed defendant, or anyone, in the past. Defendant testified he had a good relationship with Paul and that they had never before had a disagreement, verbal argument, or physical fight. Further, as we discussed in the previous section, Paul did not threaten defendant with bodily harm prior to that night, and as far as defendant knew, Paul's threats to William consisted of several frustrated punches at the wall and nasty words which defendant deemed "very empty threats." The failure to request a factually and legally unsupported instruction is not ineffective assistance of counsel. (*People v. Szadziewicz* (2008) 161 Cal.App.4th 823, 836.)

15

Further, the trial court would not have given an instruction unsupported by substantial evidence. (See *People v. Marshall, supra*, 15 Cal.4th at pp. 39-40.) Thus, any request for the instruction would have been a futile one and not required by the Sixth Amendment. (See *People v. Price* (1991) 1 Cal.4th 324, 386-387.)

Defendant also contends that counsel should have requested an instruction such as the following, quoted from *People v. Ross* (2007) 155 Cal.App.4th 1033, 1057 (*Ross*):

> "'[S]ince in the heat of conflict or in the face of an impending peril a person cannot be expected to measure accurately the exact amount of force necessary to repel an attack, that person will not be deemed to have exceeded his or her rights unless the force used was so excessive as to be clearly vindictive under the circumstances.'"

Here, the trial court instructed the jury that if defendant reasonably believed he was in imminent danger and that the immediate use of force was necessary to defend against that danger, he was entitled to use "no more force than was reasonably necessary to defend against that danger." The trial court also instructed the jury that "The defendant is only entitled to use that amount of force that a reasonable person would believe is necessary in the same situation. If the defendant used more force than was reasonable, the defendant did not act in a lawful self-defense." These instructions correctly stated the law. (See *People v. Clark* (2011) 201 Cal.App.4th 235, 250.)

There is nothing in *Ross* requiring the instruction suggested by defendant. The *Ross* court acknowledged that to justify self-defense, the force used must appear reasonably necessary under the circumstances; but the court expressly declined to define reasonable or unreasonable force, as the question before it was an erroneous instruction with regard to mutual combat. (See *Ross*, *supra*, 155 Cal.App.4th at pp. 1043, 1056-1057.) Further, its reference to the "'clearly vindictive'" language was not made to suggest an appropriate jury instruction; it was made to illustrate its criticism of the prosecutor's argument. (*Id*. at p. 1057.)

What constitutes a reasonable amount of force is a question of fact for the jury to determine. (*People v. Young* (1963) 214 Cal.App.2d 641, 646.) The *Ross* quote would

16

have taken that task away from the jury by defining all force used in self-defense as reasonable so long as it was not so excessive as to be clearly vindictive. We agree with respondent that such an instruction would be argumentative, whereas the instruction actually given was not. The jury was instructed: "When deciding whether the defendant's beliefs were reasonable, consider *all of the circumstances* as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed." (Italics added.)

Where the instructions given are complete and adequate, the trial court properly refuses language taken out of context from an appellate court opinion. (See *People v. Adams* (1987) 196 Cal.App.3d 201, 204.) Counsel does not render ineffective assistance by failing to request an instruction that most likely would have been refused. (See *People v. Price*, *supra*, 1 Cal.4th at pp. 386-387; *People v. Szadziewicz, supra*, 161 Cal.App.4th at p. 836.) Because the trial court would have properly refused both instructions, defendant demonstrated neither error of counsel nor prejudice; we thus conclude that defendant has not made a sufficient showing of ineffective assistance of counsel. (See *Strickland v. Washington*, *supra*, 466 U.S. at pp. 688, 694; *People v. Rodrigues*, *supra*, 8 Cal.4th at p. 1126.)

## III.  Cumulative effect

Defendant contends that the cumulative effect of all the asserted errors was to deny him a fair trial. Because we have found no error, we must reject defendant's claim of prejudicial cumulative effect. (*People v. Butler* (2009) 46 Cal.4th 847, 885.)

**DISPOSITION**

The judgment is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.
CHAVEZ

We concur:


_____, Acting P. J.
ASHMANN-GERST


_____, J.*
FERNS

_____

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.