Filed 12/4/13  P. v. Lee CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JULIUS LEE,<br><br>    Defendant and Appellant. | A136103<br><br>(City & County of San Francisco<br>Super. Ct. No. 10024501) |

Defendant Julius Lee appeals a judgment entered upon a jury verdict finding him guilty of attempted voluntary manslaughter (Pen. Code,[1] §§ 192, subd. (a) & 664); two counts of felony domestic violence (§ 273.5, subd. (a)); two counts of assault with a deadly weapon (§ 245, subd.(a)(1)); one count of criminal threats (§ 422); one count of aggravated attempted mayhem (§§ 205 & 664), and finding true various enhancement allegations.  Defendant was sentenced to serve eight years in prison.  He contends on appeal that there was insufficient evidence that he committed attempted aggravated

---

[1]     All undesignated statutory references are to the Penal Code.

1

mayhem and that evidence of his prior domestic violence was erroneously admitted.  We affirm.

## I. FACTS

### A.    *Background*

Lou Thomas began dating defendant in 2008.  Thomas was 5'6" tall and weighed around 190 or 215 pounds.  Defendant was 5'9" tall and weighed approximately 160 pounds.  Thomas was a security guard and considered herself to be physically and emotionally strong.

Thomas and defendant dated on and off for about four years.  Early in the relationship, Thomas became pregnant by defendant, and gave birth to their daughter in March of 2009.  According to Thomas, she and defendant had constant arguments, some of which turned physical.  They broke up around the time Thomas was five months pregnant.  Thomas did not see defendant again until she was close to giving birth.

As of July and August of 2010, Thomas and defendant were still in an "on again, off again" relationship.  They were not dating exclusively.  At this time, Thomas did not live with defendant, but she had the keys to his house, and she and their daughter had some belongings there.

### B.    *Charged Offenses*

On August 15, 2010, Thomas and her friend Sweetie Mortensen planned to go to Club Atmosphere in North Beach to see a rapper.  Prior to going to the club, they went to defendant's house where Thomas and defendant argued.  Defendant threw some of Thomas's things out of his house.  In return, Thomas threw out some of defendant's things that had been in the trunk of her car.

Thomas and Mortensen left and picked up Brittany Hooper; they arrived at Club Atmosphere around 11:00 p.m.  Defendant worked as a bouncer at Club Atmosphere.  Defendant's cousin, Jamone Simon, was also at the club that night.

Thomas and her friends stayed at the club until after closing time.  While at the club that night, Thomas drank "a lot" of alcohol, but she had a high tolerance for alcohol

2

and she did not think she was drunk. Thomas had consumed "an entire fifth of alcohol"; she drank cognac and "clear" alcohol, as well as additional alcoholic beverages. She told the police she only had a few beers at the club, but at trial insisted she had told the police about the full extent of her drinking. She also had taken some Ecstasy pills several hours before going to the club. Thomas explained that Ecstasy "enhanced" her "ability to drink more." As for the alcohol, Thomas thought it affected her temper and "[p]robably" affected her memory "a little."

While at the club, Thomas approached defendant and tried to apologize for throwing his things out, but he did not accept her apology. Around 2:30 in the morning, as Thomas was preparing to leave the club, Simon asked for a ride. Defendant, Simon, and Mortensen walked toward a bus stop to smoke, while Thomas and Hooper walked toward Thomas's car. Thomas then walked over to the group at the bus stop and asked what they were doing. Defendant said that he did not want a ride, and Thomas said it did not make sense for him to go home separately because she was driving Simon to defendant's house. Defendant became upset, slapped Thomas's face with the back of his hand, and walked away. In the course of the slap, defendant's watch struck Thomas's face, cutting her eye; Thomas's face began to swell.

Simon walked after defendant, and Thomas left with Hooper and Mortensen. While driving, Thomas received a call from Simon who asked Thomas to come back and pick him up. Thomas dropped off Hooper and then returned to North Beach to look for Simon but she could not find him.

Thomas and Mortensen then drove back to defendant's house. On the way to defendant's house, Thomas talked to him on the phone and told him she was coming over to patch up her swollen face before she went home. Defendant told her he was not at home. Thomas proceeded to call defendant numerous times, and each time he told her he was not at home. Thomas was still talking to defendant on the phone as she arrived at his house. She noted the porch light was on, but no lights were on in the house. Nonetheless, Thomas believed he was home, and she started becoming "really upset." Defendant hung up on her several times, and she kept calling him back. Still on the

3

phone with him, Thomas walked up to defendant's front door and banged on it very loudly.  When defendant did not respond, Thomas began to kick the solid wood door.  She damaged the door, but stopped short of breaking it open because she did not want to pay to have the door replaced.

Thomas returned to her car, sat in the driver's seat with the windows down, and smoked a cigarette.  Mortensen was in the passenger seat.  Less than five minutes later, defendant came out of his house and Thomas saw him approach with a knife in his hand.  When Thomas first saw the knife, defendant had it in his left hand, raised and pointed downward slightly at less than a 90 degree angle.  As he walked over to the car, he switched the knife to his right hand, and said "Bitch, I'm gonna go kill you."  He told Mortensen to get Thomas out of there before he killed her.  While Thomas was seated in the car, defendant stabbed her twice in her left arm.  Defendant said something to Mortensen and then tried to stab Thomas again.  As defendant leaned into the car, Thomas turned away and defendant stabbed her in her right arm.  Thomas then grabbed defendant's wrist and pulled him into the car by his hair, as she tried to pin him against the steering wheel.  When defendant tried to cut Thomas's face, she released his hair and tried to grab the knife.  The two continued to struggle and Thomas held his wrist as defendant held the knife towards her face.  Defendant managed to cut Thomas on her nose and cheek.  Mortensen in the meantime had called the police.  Thomas had defendant against the steering wheel when she saw the police drive past; she began blowing the horn by pressing defendant against it while Mortensen screamed.  The police returned and defendant ran back to his house.

Thomas testified she was not sure if defendant was trying to kill her when he first stabbed her; she said, "I knew he meant to hurt me."  Had Thomas not moved when defendant stabbed her arm the first two times, the knife would have cut her face and neck.  Thomas believed that if she had not fought back when defendant pointed the knife at her face defendant probably would have cut her throat and face.

## C. *Police and Paramedics Respond*

### 1. *Police Investigation*

San Francisco Police Officer Kneuker responded to a dispatch call to defendant's residence; Officer Kneuker and his field training officer happened to be patrolling about a block away. When the officers arrived, Thomas and Mortensen ran up towards them screaming and yelling hysterically; they seemed to be in a state of shock. The two officers approached the house with firearms drawn and as they drew near, defendant opened the door. After some initial hesitation, he complied with their orders to leave the house and was arrested. Defendant did not have any visible injuries. Officer Kneuker did not smell any alcohol on defendant's breath.

An eight-inch knife was recovered from underneath Thomas's car. Thomas identified the knife as the one defendant had used to stab her.

Officer Kneuker found Thomas difficult to speak with, as she was crying, hysterical, and appeared to be "trying to rethink what just happened." She seemed to be in shock, and was having trouble recalling things that had occurred minutes before. Officer Kneuker smelled alcohol on Thomas's breath, but noted that she was coherent. By the end of the interview, Thomas was able to give a detailed narrative of the events.

Officer Kneuker testified that Mortensen was agitated, scared, and jumpy when he arrived at the scene. Mortensen said that she and Thomas had been at a club with defendant earlier that night. Defendant and Thomas got into a verbal argument; defendant punched Thomas in the face and left. Thomas and Mortensen drove to defendant's house, where he came out with a knife and started stabbing Thomas. He also grabbed Thomas's neck and told her, "I'm about to kill you." Mortensen called 911.

In a recorded interview, Mortensen spoke to Officer Martinez about the incident. In the interview, which was played for the jury, Mortensen relayed that the verbal argument concerned Thomas wanting defendant to ride in the car with her and defendant refusing to do so. Thomas swore at defendant and then he hit her

5

with his fist. On the drive to defendant's house, Thomas spoke with him by telephone several times, frequently yelling.

Mortensen said that when defendant came out of his house, he had a knife in his hand and he told Thomas to leave, but she refused to do so. Defendant grabbed Thomas's neck, choking her, and said, "bitch, I'm gonna kill you." Defendant stabbed Thomas in the neck. Mortensen tried to pull defendant off Thomas. Mortensen had been drinking a lot.

### 2. *Thomas's Injuries*

Paramedics arrived and treated Thomas's injuries. Thomas was loud, agitated, and yelling; she seemed unconcerned about her injuries but very upset about the incident. Her vital signs were stable, and the paramedic did not feel she was seriously injured or that she required immediate medical attention beyond cleaning the wounds. The treatment consisted of cleaning the wounds, disinfecting them, and applying bandages. Thomas did not follow up with any medical care; she treated her wounds at home using Neosporin. It took about three weeks for the wounds to completely heal and the scabs to come off, but Thomas experienced pain in her arm for two to three months afterwards.

The three cuts on her face were superficial. One was in the corner of her left eye, along the side of her face near the temple. The second one was in the crease between her lips and cheek. The third cut was in the crease of her nose. None of the cuts left any kind of permanent scars. She had two lacerations on her left hand, two puncture wounds on her left arm, and a laceration and abrasion on her right arm. The puncture wounds were not actively bleeding, and the paramedic estimated they were between a quarter to a half inch in length. The punctures did not appear to be very deep, but the paramedics recommended Thomas go to the hospital to determine if stitches were required.

### D. *Mortensen's Trial Testimony*

Mortensen testified that at the time of the incident she and Thomas were very close, but they were no longer friends. On the night of the incident Mortensen drank "a

lot," and was intoxicated. She denied taking any drugs. Mortensen's memory of the events of that night and early morning was quite poor. She did not recall the fight between defendant and Thomas at the bus stop, but she did recall Thomas's face being swollen. She also recalled Thomas wanted to go to defendant's house and refused to go to Mortensen's house. She recalled giving Hooper a ride, trying to find Simon back in North Beach, and ultimately driving to defendant's house.

Although she did not specifically remember the incident, she acknowledged signing a statement in which she stated defendant hit Thomas outside the club. She also acknowledged signing a statement in which she wrote that defendant tried to stab Thomas with a knife.

### E. *Prior Acts of Domestic Violence*

The prosecution introduced testimony of Anna Novikov, defendant's former girlfriend, detailing various prior incidents of domestic violence, one of which led to a felony conviction. Thomas also testified as to numerous prior incidents.

#### 1. *Prior Incidents with Anna Novikov*

Anna Novikov had previously been in a romantic relationship with defendant for about two years. The relationship ended in 2007. Novikov stated the relationship "was good for the most part . . . but . . . then he became violent." Sometime in 2007, Novikov and defendant had an argument in his apartment in San Francisco. They left the apartment and continued to argue as they walked down Market Street. Defendant then turned around and choked her, using two hands, for about ten seconds, and then he let go. Novikov told him he was crazy and walked off. Defendant followed her and caught up with her about two blocks later. He began apologizing and they started talking. Then, as they were talking, Novikov saw a blur from the corner of her eye, and defendant hit her right ear.

The force of the blow ruptured her ear drum and she heard an intense ringing in her ear. She stumbled back and defendant grabbed her and pushed her against a building. Defendant grabbed her face and was telling her it was her fault, and that he could not believe she had made him do this. Defendant took Novikov by the arm and

they began walking. She told him to let her go and leave her alone. Defendant looked at her and said "do you want me to kill you right now?" Defendant walked her home and Novikov told him she was done with the relationship.

She did not report the incident to the police, but she did seek medical attention, and had to have surgery to repair her ear drum. The skin from the back of her ear was removed and grafted over her the ruptured drum. She suffered permanent loss of 33 percent of her hearing in that ear. After the incident, Novikov stopped answering defendant's calls.

However, defendant called frequently, and eventually Novikov started answering his calls because she was afraid he would just show up at her house or work. Novikov struggled as her feelings for defendant came back at the same time she was frightened and upset by his previous behavior. When they did talk, defendant asked to get back together with her.

On June 12, 2007, after some period of time during which Novikov and defendant had not spoken, she received a call from him. Defendant told her he was downstairs outside her house, and asked her to come down as he had a gift for her. At first Novikov refused, but eventually she came downstairs and defendant was outside her gate with pictures and glass swan with a flower in it. Novikov stepped outside, took the gifts, thanked him and started walking away. Defendant grabbed her arms, preventing her from walking away. Novikov asked him what he was doing and why he was there; "he got mad and it was, like, a switch and his eyes, just like he flipped a switch and it just flipped."

Defendant pushed her against her garage door and then threw her hard on the ground and pushed her face into the pavement. Novikov saw defendant raise his fist, and she figured he would break her jaw with the punch; eventually she started thinking he would kill her. She was screaming, and before defendant could deliver the blow, her seventy-five year old grandfather pushed defendant off her. At that point, she ran inside and called the police. She also reported the previous incident with her eardrum to the

8

police. Prior to the incident outside her house, she had not disclosed defendant's behavior to anyone but some friends, nor had she made any reports.

On cross-examination, Novikov revealed there had been another choking incident in Marin County during a time when she and defendant been broken up. Defendant found out that she had met someone else and got very upset and choked her. She did not go to the police, nor did she tell her parents or see a doctor.

2.      *Prior Incidents with Thomas*

a.      2008 Incident

Sometime in 2008 Thomas and defendant were at his apartment and they began arguing "about something stupid" and defendant began throwing out Thomas's possessions. Although she was four months' pregnant at the time, Thomas had not disclosed the pregnancy to defendant. She grabbed defendant, and tried to prevent him from throwing out her belongings. Defendant dragged Thomas out of the house by her hair. He also slapped her "a couple times." Defendant locked her out of his house, threw her possessions outside the house, and then left. Thomas did not seek medical treatment, nor did she report the incident to the police.

b.      2009 Choking Incident

Four or five months later, in early 2009, when Thomas was eight or nine months pregnant, she and defendant argued again. Thomas had loaned defendant some money and, upon learning he was able to pay her back, she and a friend went to his house to pick up the repayment. Defendant was not there when Thomas arrived, so she and her friend waited for about a half hour. When he showed up, "he acted like he didn't want to give [Thomas her] money," so they began arguing and defendant began choking her. During the choking, Thomas's face turned purple; she sustained two black eyes afterwards. It took her "about 20 minutes" to get her "breathing back to normal." Thomas was on the floor and defendant then ran toward her and tried to kick her in the stomach, but Thomas's friend intervened before he could strike her.

9

Thomas did not immediately seek medical attention, but did later go to Planned Parenthood, where she was receiving pre-natal care, because her lip remained purple for a while after the incident.

### c. 2009 Incident in New Orleans

Approximately a month after their daughter was born, Thomas and defendant resumed their relationship. In July of 2009, Thomas, defendant, and their daughter were in New Orleans visiting defendant's family. While there, the two argued about defendant's level of participation in caring for their daughter during the trip. While Thomas was holding their daughter, defendant slapped her several times hard enough to give her a black eye. In the course of striking Thomas, defendant ended up hitting their daughter, as well. She cried and suffered some welts on her face. Thomas did not report the incident to the police, nor did she seek medical attention.

### d. Mother's Day 2010 Incident

On Mother's Day 2010, Thomas, defendant, and their daughter were at his house in San Francisco. Thomas and defendant were arguing; Thomas was upset that defendant had called the mother of his other child using Thomas's phone without telling her. Thomas was sitting, holding their daughter. The argument escalated, and defendant stood up and slapped Thomas in the face "five times." Thomas did nothing in response, and nothing further occurred, except that their daughter cried. Thomas's face was a little puffy and red from the incident, but she suffered no injuries. She neither reported the incident to the police nor sought medical attention.

## F. Defense Case

The defense called three witnesses, primarily to testify as to defendant's character for peacefulness.

Jamone Simon, defendant's cousin, was at the club on the night in question. Simon said he, Thomas, and Mortensen all took Ecstasy at the club, not hours before as Thomas had claimed. Simon thought that both the women were very intoxicated, much more so than he was. Simon, however, did not see the charged incidents.

Both Simon and defendant had moved to San Francisco from New Orleans after surviving Hurricane Katrina. He testified that defendant has a reputation for being peaceful, a "very laid-back person."

Defendant's childhood friend, Ronald Billy, had moved to San Francisco and invited defendant to live with him there. Billy testified as to defendant's character for peacefulness. He had not seen defendant act violently. He was aware that defendant had been accused of being violent against others, including Novikov, which led to a conviction, but it did not change his opinion of him. When asked whether his opinion of defendant would be different if he knew that defendant ruptured Novikov's eardrum and assaulted Thomas when she was eight months pregnant, Billy admitted such things could change his opinion "a little."

Shentell Guillot dated defendant for five years and had a child with him. She said Thomas would often call her, "like I was her sister or something." On the night of the incident, Thomas called Guillot and told her, "I'm gonna fuck the nigga Julius [defendant] up. I'm on ten [E]cstasy pills right now." Guillot offered her opinion of defendant's good character and peacefulness. She noted that there was never any violence on his part during her relationship with him. However, Guillot would be rough with defendant and she sometimes hit him. Defendant never retaliated against her. On cross-examination she acknowledged that hearing about defendant's conviction for the incident involving Novikov and his attacking Thomas when she was eight months pregnant probably would make a difference in her opinion.

## II. DISCUSSION

### A. *Substantial Evidence Supports the Attempted Aggravated Mayhem Conviction*

Defendant contends his convictions for attempted aggravated mayhem must be reversed because there was insufficient evidence to prove he acted with the requisite specific intent to maim Thomas. This claim is meritless.

#### 1. *Standard of Review and Applicable Law*

"In assessing a claim of insufficiency of evidence, the reviewing court's task is to review the whole record in the light most favorable to the judgment to determine whether

11

it discloses substantial evidence-that is, evidence that is reasonable, credible, and of solid value-such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] The federal standard of review is to the same effect: Under principles of federal due process, review for sufficiency of evidence entails not the determination whether the reviewing court itself believes the evidence at trial establishes guilt beyond a reasonable doubt, but, instead, whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. [Citation.] The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence. [Citation.] ' "Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court[,] which must be convinced of the defendant's guilt beyond a reasonable doubt. ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment." ' [Citations.]" ' [Citation.]" (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.)

" 'An appellate court must accept logical inferences that the [finder of fact] might have drawn from the circumstantial evidence.' [Citation.] 'Before the judgment of the trial court can be set aside for the insufficiency of the evidence, it must clearly appear that on no hypothesis whatever is there sufficient substantial evidence to support the verdict of the [finder of fact].' [Citation .]" (*People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1573.) "Perhaps the most fundamental rule of appellate law is that the judgment challenged on appeal is presumed correct, and it is the appellant's burden to affirmatively demonstrate error. [Citation.] Thus, when a criminal defendant claims on appeal that his conviction was based on insufficient evidence of one or more of the elements of the crime of which he was convicted, we *must* begin with the presumption that the evidence of those elements *was* sufficient, and the defendant bears the burden of convincing us otherwise. To meet that burden, it is not enough for the defendant to simply contend,

12

'without a statement or analysis of the evidence, . . . that the evidence is insufficient to support the judgment[ ] of conviction.' [Citation.] Rather, he must *affirmatively demonstrate* that the evidence is insufficient." (*Ibid.*) With this standard in mind, we review whether there was sufficient evidence to support defendant's conviction for attempted aggravated mayhem.

Simple mayhem is defined by section 203, which provides: "Every person who unlawfully and maliciously deprives a human being of a member of his body, or disables, disfigures, or renders it useless, or cuts or disables the tongue, or puts out an eye, or slits the nose, ear, or lip, is guilty of mayhem."

Aggravated mayhem is defined by section 205, which provides: "A person is guilty of aggravated mayhem when he or she unlawfully, under circumstances manifesting extreme indifference to the physical or psychological well-being of another person, intentionally causes permanent disability or disfigurement of another human being or deprives a human being of a limb, organ, or member of his or her body. For purposes of this section, it is not necessary to prove an intent to kill. Aggravated mayhem is a felony punishable by imprisonment in the state prison for life with the possibility of parole." Unlike simple mayhem, aggravated mayhem is a specific intent crime. (*People v. Park* (2003) 112 Cal.App.4th 61, 64 (*Park*) [aggravated mayhem "requires the specific intent to cause the maiming injury"]; *People v. Ferrell* (1990) 218 Cal.App.3d 828, 832-833 (*Ferrell*) [unlike § 203, § 205 includes an intent requirement].) The specific intent to cause the maiming injury is an element of the crime. (*People v. Lee* (1990) 220 Cal.App.3d 320, 324-325.) Because the evidence of a defendant's state of mind is almost inevitably circumstantial, a jury "may infer a defendant's specific intent from the circumstances attending the act, the manner in which it is done, and the means used, among other factors. [Citation.]" (*Ferrell, supra,* 218 Cal.App.3d at p. 834.) The requisite intent may not be inferred simply from the fact that the injury inflicted constitutes mayhem; there must be other facts and circumstances supporting an inference of intent to maim. (*Park, supra,* 112 Cal.App.4th at p. 64; *Ferrell, supra,* 218 Cal.App.3d at p. 835.) Evidence that shows no more than an " ' "indiscriminate

13

attack" ' " is insufficient to prove the specific intent necessary to support a conviction for aggravated mayhem. (*Lee, supra,* 220 Cal.App.4th at p. 325.) However, " '[e]vidence of a "controlled and directed" attack or an attack of "focused or limited scope" may provide substantial evidence of' a specific intent to maim." (*People v. Szadziewicz* (2008) 161 Cal.App.4th 823, 831.)

2.      *Sufficient Evidence of Specific Intent*

Defendant contends the evidence shows only that he committed an indiscriminate attack in the heat of passion, not that he acted with the specific intent to maim Thomas. We disagree. The jury could reasonably infer from the circumstances and nature of the attack that defendant's actions reflected not merely indiscriminate violence, but an intent to maim. Defendant approached Thomas with a knife that had an 8-inch blade. After stabbing Thomas twice in her left arm, Thomas pulled him into the car and tried to pin him against the steering wheel while holding his wrist. Defendant still had the knife in his hand as Thomas held his wrist. As they struggled, defendant pointed the knife to Thomas's face. Although Thomas was strong enough to fight back, defendant managed to nick her a couple of times with the knife on her nose and cheek. Additionally, Thomas sustained a cut by her left eye. These circumstances could lead the jury to conclude that defendant intended to maim Thomas.

Defendant points to cases in which the courts concluded that the focused nature of an attack was sufficient to support a finding of specific intent, and argues that the facts here show instead a "spontaneous and wild attack" that does not support such a finding. For instance, in *Ferrell, supra,* 218 Cal.App.3d at pages 835-836, the court noted that a single shot to the neck was a directed and controlled attack which, if not fatal, was likely to disable the victim permanently, and concluded the jury could properly infer that the defendant intended to kill the victim, or, if unsuccessful, to disable her permanently. In *Park, supra,* 112 Cal.App.4th at pages 69-70, the court concluded that evidence that the defendant threatened the victim, retrieved a knife sharpener, and confronted him outside a restaurant and asked hostile questions before attacking him with the knife sharpener indicated that the attack was "the product of deliberation and planning, not an explosion

14

of indiscriminate violence," suggesting that the defendant intended to maim. Furthermore, the defendant directed his attack at the victim's head, bringing the weapon down from behind his head, thereby giving his blows more force, and stopped once he had maimed the victim's face. Similarly, in *People v. Quintero* (2006) 135 Cal.App.4th 1152, 1163, the defendant initially attacked the victim's head, using deliberate uppercut motions to slash his face and holding him by the hair, and stopped his attack once he had severely maimed the victim's face. The injuries to the victim's arms and hands occurred as the victim tried to protect his face. (*Ibid.*) The court concluded that from these facts, the jury could conclude that the attack was guided by the specific intent of inflicting serious injury on the victim's face and head. (*Ibid.*) In *People v. Szadziewicz, supra,* 161 Cal.App.4th at page 829, the defendant focused the attack on the victim's face, slicing it from his temple toward the nose, then back toward the ear. The defendant then sliced above the victim's eyebrow down through his nostril, splitting his nose wide open. (*Ibid.*)

Defendant argues that evidence showing "a directed, focused attack" on Thomas's face is "sorely missing" in the instant case. We disagree. In attacking Thomas, not only did defendant cut Thomas on her nose and cheek, but he also cut her near her left eye. Such injuries suggest not an indiscriminate attack, but a focused one, and that defendant intended to disfigure Thomas. Nevertheless, we recognize that defendant also attacked Thomas's arms and threatened to kill her. However, a broader attack need not negate an inference that the defendant acted with the intent to disfigure the victim. (See *People v. Szadziewicz, supra,* 161 Cal.App.4th at p. 832.) Here, although Thomas's face may not have been the sole focus of defendant's violence, the jury could reasonably conclude that his actions, in conjunction with the surrounding circumstances, showed that he acted with the intent to maim or disfigure Thomas.

## B.     *Prior Acts of Domestic Violence Properly Admitted*

Defendant contends that the trial court erred in admitting evidence of his prior domestic violence incidents under Evidence Code section 1109 because the evidence

lacked probative value, was highly prejudicial and cumulative, and violated his rights to a fair trial.

### 1. Background

The prosecution sought to admit numerous alleged prior acts of domestic violence, pursuant to Evidence Code section 1109. Over defense objection, the court admitted the requested evidence. Specifically, the court admitted the following incidents: 1) the 2006 incident where defendant strangled Novikov at a bus stop in Marin County;[2] 2) the 2007 incident where defendant strangled Novikov in Downtown San Francisco and then struck her on the side of her head and ruptured her ear drum; 3) the June 2007 incident where defendant assaulted Novikov in front of her home in San Francisco by pushing her against the garage door and throwing her to the pavement, at which point her grandfather intervened; 4) the 2008 incident where defendant assaulted Thomas, who was four months pregnant, by pulling her out of his house by her hair; 5) the February 2009 incident where defendant strangled Thomas while she was 8 months pregnant and attempted to kick her in the stomach; 6) the July 2009 New Orleans incident where defendant slapped Thomas several times, while their 4-month old daughter was on her lap; and 7) the May 2010 incident occurring on Mother's Day, where defendant slapped Thomas on the face multiple times, while their daughter was on her lap.

In making its ruling, the court explained that the 2007 (Novikov) incidents were "not remote in time, [and] the amount of time involved in introducing and refuting the evidence will be de minimis." "In addition, while the conduct is inflammatory, it is no more inflammatory [than the charged acts.] There was no weapon used in either of these incidents except for [defendant's] bare hands, and again, these incidents followed arguments between Ms. Novikov and [defendant]." Finally, as to all the incidents, the court also conducted an Evidence Code section 352 analysis, making the "specific

---

[2] The court excluded the 2006 choking incident with Novikov due to late discovery. However, trial counsel inquired about it on cross-examination, and thus the matter was revealed to the jury. Defendant does not challenge the admission of the 2006 choking incident into evidence.

finding" that even "including the pregnancy . . . the probative value of the evidence is not substantially outweighed by the possibility that the admission of any of this evidence will either necessitate any undue consumption of time or create a substantial danger of undue prejudice, confusion of issues, or mislead the jury . . ."

### 2. *Standard of Review and Applicable Law*

"A trial court's ruling admitting evidence of other crimes is reviewable for abuse of discretion." (*People v. Hayes* (1990) 52 Cal.3d 577, 617; *People v. Gray* (2005) 37 Ca1.4th 168, 202-203; *People v. Carter* (2005) 36 Ca1.4th 1114, 1147-1148.) "Under Evidence Code section 1109, evidence of a prior act of domestic violence is admissible to prove the defendant had a propensity to commit domestic violence when the defendant is charged with an offense involving domestic violence. The trial court has discretion to exclude the evidence if its probative value is outweighed by a danger of undue prejudice or confusing the jury, or would result in an undue consumption of time. (Evid. Code, §§ 1109, subd. (a)(1), 352.)" (*People v. Rucker* (2005) 126 Cal.App.4th 1107, 1114.)

" 'Domestic violence,' " under Evidence Code section 1109, "is broadly defined as 'abuse committed against an adult or a minor who is a spouse, former spouse, cohabitant, former cohabitant, or person with whom the suspect has had a child or is having or has had a dating or engagement relationship.' ( . . . § 13700, subd. (b); Evid. Code, § 1109, subd. (d).) 'Abuse' is defined as 'intentionally or recklessly causing or attempting to cause bodily injury, or placing another person in reasonable apprehension of imminent serious bodily injury to himself or herself, or another.' ( . . . § 13700, subd. (a); see Evid. Code, § 1109, subd. (d).)" (*People v. Rucker, supra,* 126 Cal.App.4th at pp. 1114.)

In exercising its discretion to admit or exclude evidence of prior domestic violence acts under Evidence Code section 352, the court must balance the probative value of the evidence "against four factors: (1) the inflammatory nature of the uncharged conduct; (2) the possibility of confusion of [the] issues; (3) remoteness in time of the uncharged offenses; and (4) the amount of time involved in introducing and refuting the evidence of uncharged offenses." (*People v. Branch* (2001) 91 Cal.App.4th 274, 282; see also *People v. Harris* (1998) 60 Cal.App.4th 727, 737-740.) " ' "The 'prejudice' referred to in

17

Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against defendant as an individual and which has very little effect on the issues. In applying section 352, 'prejudicial' is not synonymous with 'damaging.' " ' " (*Rucker, supra,* 126 Cal.App.4th at p. 1119.) We will not disturb a trial court's exercise of discretion under Evidence Code section 352 " ' "*except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice." [Citations.]' [Citation.]" (*People v. Brown* (2000) 77 Cal.App.4th 1324, 1337.)

3. *No Abuse of Discretion in Admitting Prior Acts of Domestic Violence*

Defendant does not dispute that evidence of a person's prior domestic violence is admissible in criminal actions involving domestic violence. However, he argues that the trial court erred in the instant case because "the propensity evidence was not sufficiently probative to be admissible." According to defendant, his "defenses went only to the degrees of the crimes, not to his general culpability." Thus, defendant asserts that "[h]ad this been a case with a recanting or missing victim, or had [he] testified and denied the events occurred, some of the propensity evidence would likely have been admissible . . . ." (Italics omitted.) However, defendant insists that the propensity evidence "simply served to agitate and inflame the jury," the cumulative effect of which was to portray him as a "violent madman." (Original capitalization omitted.)

Contrary to defendant's contention, the probative value of the prior uncharged conduct was great. In each of the previous incidents, defendant resorted to violence when he got into an argument with his girlfriend. This evidence was particularly relevant in the instant case. (See *People v. Johnson* (2010) 185 Cal.App.4th 520, 532, fn. 8 [battering episode likely part of larger scheme that escalates in frequency and severity].)

Specifically, the incidents involving Novikov demonstrated an escalating pattern of violence that was similar to the pattern of violence defendant committed against Thomas. (See *People v. Johnson, supra,* 185 Cal.App.4th at p. 533 [common factors in all three crimes suggested defendant had anger management problem regarding female intimate partners].) Moreover, the prior incidents with Novikov were not remote in time

18

and they were no more inflammatory than the charged offenses.  Also, there was no potential for jury confusion and Novikov's testimony did not consume an undue amount of time.

Regarding the incidents involving Thomas, these prior acts of domestic violence were highly relevant to the charged offenses.  On four different occasions, when defendant got into an argument with Thomas, defendant physically attacked Thomas, each time targeting her head, neck, or face.  The offenses were recent and were no more inflammatory than the charged offenses, in which defendant wielded an 8-inch knife.  Additionally, there was no potential for juror confusion.  Thomas's testimony regarding the prior incidents represented only a minor portion of her trial testimony.

Even though the evidence of defendant's prior acts of domestic violence undoubtedly was damaging to the defense, its detrimental effect did not substantially outweigh the probative value of the evidence. " ' "The prejudice that section 352 ' "is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence." ' [Citations.]" ' " (*People v. Scott* (2011) 52 Cal.4th 452, 491.)  " ' "Evidence is not prejudicial, as that term is used in a section 352 context, merely because it undermines the opponent's position or shores up that of the proponent.  The ability to do so is what makes evidence relevant." ' " (*People v. Scott*, *supra*, 52 Cal.4th  at p. 490.)  Here, the trial court did not abuse its discretion in allowing evidence of  defendant's prior acts of domestic violence.

## C.    *Assistance of Counsel*

Defendant argues that he was denied effective assistance of counsel to the extent his trial counsel failed to adequately preserve for appellate review his challenge to the admission of his prior acts of domestic violence under Evidence Code section 1109.  Inasmuch as we have addressed this claim and concluded that it fails on the merits, we need not address defendant's claim of ineffective assistance of counsel based on trial counsel's alleged failure to specifically object to each challenged incident.

19

# III. DISPOSITION

The judgment is affirmed.

_____
REARDON, J.

We concur:

_____
RUVOLO, P. J.

_____
HUMES, J.